IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MALBCO HOLDINGS, LLC, individually and as
assignee of Centennial Inn-Vestments, LLC,

                        Plaintiff,

     v.

AMCO INSURANCE COMPANY, a foreign
insurance corporation, and WAUSAU BUSINESS
INSURANCE COMPANY, a foreign insurance
company,

                        Defendants.

CV-08-585-ST

OPINION AND ORDER

STEWART, Magistrate Judge:

## **INTRODUCTION**

       Plaintiff, Malbco Holdings, LLC, ("Malbco"), is the owner of a La Quinta Inn and Suites

located in Eugene, Oregon (the "Hotel"). Malbco purchased the Hotel in August 2005 from

Centennial Inn-Vestments, LLC ("Centennial"). Malbco and Centennial recognized that the

Hotel had some localized water damage, the extent of which was unknown. In 2004, prior to the

purchase of the Hotel by Malbco, Centennial tendered claims concerning this damage to its

1 - OPINION AND ORDER

insurers, defendants AMCO Insurance Company ("AMCO") and Wausau Business Insurance

Company ("Wausau"), both of which denied coverage.  As part of their purchase agreement in

August 2005, Malbco and Centennial agreed that Malbco would acquire Centennial's rights in its

insurance policies covering the Hotel as part of the transaction.  Additionally, Malbco became a

named insured under the AMCO policy, effective July 31, 2005, and purchased policies from

AMCO thereafter.

Malbco contends that, in late 2005 after it purchased the Hotel, the Hotel suffered a

"collapse" as that term is used in the Wausau and AMCO policies.  Following emergency repair

work performed in late 2005 and 2006, Malbco tendered claims for coverage to both defendants

in June 2006.  Both defendants denied coverage in 2007.

Malbco filed this action against AMCO and Wausau in Spokane County Superior Court

on October 24, 2007, alleging claims for breach of contract, violation of Washington's Consumer

Protection Act ("CPA"), RCW Ch. 19.86, breach of the duty of good faith and fair dealing, and

seeking a declaration that its losses are covered under the policies issued by AMCO and Wausau.

Complaint, pp. 7-10.  *Malbco Holdings, LLC v. AMCO Ins. Co., et al.*, Spokane County Civil

Case No. 07-2-04878-7.  Defendants subsequently removed the case to the United States District

Court for the Eastern District of Washington on December 6, 2007, premised upon complete

diversity of citizenship pursuant to 28 USC § 1332.  *Malbco v. AMCO Ins. Co., et al.*, Eastern

District of Washington Civil Case No. 2:07-389-RHW, Notice of Removal (docket #1), p. 2.  On

May 12, 2008, District Judge Robert H. Whaley granted defendants' Motion to Change Venue

and the action was transferred to this court.  Original File, Copy of Transfer Order (docket #1).

Defendants have now filed four summary judgment motions, including: (1) AMCO's Motion for Summary Judgment (docket #108); (2) Wausau's Motion for Partial Summary Judgment Re: Application of Oregon Law (docket #113); (3) Wausau's Motion for Partial Summary Judgment Re: Invalidity of Assignment (docket #117); and (4) Wausau's Motion for Partial Summary Judgment Dismissal of Extra-Contractual Claims, or, in the Alternative, for Bifurcation and Stay of Same (docket #120).

In addition, both AMCO and Wausau filed motions seeking to strike certain evidence submitted by Malbco in connection with its responses to defendants' motions for summary judgment, namely: (1) AMCO's Motion to Strike Summary Judgment Evidence (docket #137); and (2) Wausau's Motion to Strke Summary Judgment Evidence and Joinder in AMCO's Motion to Strike Summary Judgment Evidence (docket #139). This court has ruled on the motions to strike and will not consider evidence stricken by those rulings in connection with the summary judgment motions.

Malbco is a Washington limited liability company with its principal place of business in Spokane County, Washington. Notice of Removal (docket #1), ¶ 5. Wausau is a Wisconsin corporation with its principal place of business in Wausau, Wisconsin. Notice of Removal (docket #1), ¶ 5; *see also* Complaint, ¶ 1.3 and Wausau's Answer (docket #8), ¶ 1.3. AMCO is an Iowa corporation with its principal place of business in Iowa. *Id*; *see also*, Complaint, ¶ 1.2 and AMCO's Answer (docket #9), ¶ 1.2. The amount in controversy exceeds $75,000.00, exclusive of interest and costs. Notice of Removal (docket #1), ¶ 6. Thus, this court has jurisdiction based on diversity of citizenship of the parties pursuant to 28 USC §1332.

All parties have consented to allow a Magistrate Judge to enter final orders and judgment

in this case in accordance with FRCP 73 and 28 USC § 636(c).

For the reasons that follow:

(1) AMCO's Motion for Summary Judgment (docket #108) is GRANTED in part and

DENIED in part;

(2) Wausau's Motions for Partial Summary Judgment Re: Application of Oregon Law

(docket #113) and Re: Invalidity of Assignment (docket #117) are GRANTED; and

(3) Wausau's Motion for Partial Summary Judgment Dismissal of Extra-Contractual

Claims, or, in the Alternative, for Bifurcation and Stay of Same (docket #120) is DENIED AS

MOOT.

## UNDISPUTED FACTS

Centennial, an Oregon limited liability company, previously owned the Hotel.[1]  On

September 22, 1998, Centennial and Hospitality Associates, Inc. ("Hospitality"), a Washington

corporation, entered into a Management Contract ("Centennial/Hospitality Contract").

Declaration of Michael S. Rogers in Support of AMCO's Motion for Summary Judgment (docket

#110-112) ("Rogers Decl."), Ex. 6.  Among other things, the Centennial/Hospitality Contract

required Hospitality to obtain and maintain, on Centennial's behalf, certain policies of insurance,

including insurance against property damage to the Hotel.  *Id*, Ex. 6, pp. 7-8.

Wausau is a Wisconsin corporation.  Wausau Policy No. 5260-00-000194 ("the Wausau

Policy"), issued to Centennial, was in effect and provided insurance coverage for the Hotel from

May 15, 2000, to May 15, 2003.  Declaration of Maria Sotirhos in Support of Wausau's Motion

---

[1]  The Hotel previously was known as the "Hawthorne Inn and Suites" and is so listed on the Wausau policy.

for Partial Summary Judgment Re: Application of Oregon Law (docket #116) ("Sotirhos Decl."),

Ex. 1; Complaint, ¶ 3.3; Wausau's Answer (docket #8), ¶ 3.3.  AMCO Policy Nos. ACP

7501296004, ACP 7511296004, and ACP 7521296004 ("the AMCO Policies") covered the

Hotel from May 15, 2003, to July 31, 2005.  Complaint, ¶ 3.4.  Because Wausau and AMCO

never issued policies to Malbco prior to July 31, 2005, Malbco's claims under the policies in

effect prior to that date require a valid assignment from Centennial to Malbco.  Thus, Malbco

has filed suit against Wausau and AMCO under those policies as Centennial's assignee.

       In early 2004, Centennial investigated water damage to part of the Hotel.  It then

submitted claims for the water damage to both AMCO and Wausau in February and April 2004,

respectively.  Wausau and AMCO denied the initial claim in May and June 2004, respectively.

       In May 2004, Malbco entered into a Purchase and Sale Agreement ("PSA") to purchase

the Hotel from Centennial.  Declaration of James Mulloy in support of Plaintiff's Reply Brief in

Support of Motion for Summary Judgment Re: Choice of Law (docket #153) ("Mulloy Second

Decl."), Ex. E.  Afer five amendments to the PSA, the closing occurred in August 2005.  The First

Amendment to the PSA dated March 9, 2005, added the following provisions:

> 1.2.8  All claims, including claims against contractors, insurance
> proceeds, and causes of action dealing with any and all damage to
> the Property, including, without limitation, claims relating to the
> water loss more particularly described within section 8.
>
> *          *          *
>
> 8.  Pending Insurance Claim.  Seller and Buyer both acknowledge
> that there is known water damage to the Property.  The full extent of
> the damage is not presently known by either the Seller or the Buyer.
> Seller and Buyer both agree that the purchase price under this
> amended agreement has not been reduced or otherwise effected [sic]
> by the known or unknown water damage.  As partial consideration
> for entering into this Amended Purchase and Sale Agreement, Seller

hereby fully assigns to Buyer all of its right, title, and interest to any
and all policies of insurance in which the Seller has an interest
relating to the Property, including, without limitation, all insurance
policies that may potentially provide coverage for damage to the
Property.  Seller agrees to act in good faith and to use all reasonable
efforts to assist the Buyer in obtaining any and all insurance
coverage that Seller would otherwise be entitled to under any policy
of insurance relating to the Property.  Seller and Buyer further agree
that it is their respective intent that the Buyer be the sole and
exclusive beneficiary and recipient of any and all insurance
proceeds paid under any policy of insurance issued to Seller
concerning the subject Property as reimbursement for any known or
unknown damage to the Property.

The PSA also contains an express Oregon choice-of-law provision, which provides:  "12.6

Governing Law and Severability.  This Agreement shall be governed by and construed under the

laws of the State of Oregon, without regard to its conflict of laws principles."

After purchasing the Hotel, Malbco leased it to Day Island Hotel Operations, Inc. ("Day

Island") for a period of 10 years.  Rogers Decl., Ex. 7.  The lease required Day Island to obtain

and keep in force insurance policies covering loss or damage to the Hotel.  *Id*, Ex. 7, p. 5.  Day

Island in turn entered into a Management Contract with Hospitality ("Day Island/Hospitality

Management Contract").  *Id*, Ex. 8.  As did the Centennial/Hospitality Contract, the Day

Island/Hospitality Management Contract required Hospitality to obtain and maintain, on Day

Island's behalf, certain policies of insurance, including insurance against property damage to the

Hotel.  *Id*, Ex. 8, pp. 6-7.  Accordingly, Hospitality engaged the services of a broker to purchase

insurance for the Hotel.  The broker did so by requesting a "name change for financial and tax

purposes" on the existing AMCO policy from "La Quinta Inn & Suites dba Centennial Inn-

Vestments, LLC and Hospitality Associates, Inc." to "La Quinta Inn & Suites dba Malbco

Holdings, LLC dba Day Island Hotel Operations, Inc. and Hospitality Associates, Inc."  *See* Reply

Declaration of Michael S. Rogers Re: Summary Judgment on Anti-Assignment Provision (docket #180) ("Rogers Reply Decl."), Ex. 8 (Dineen Depo. Ex. 8) (named insured effective February 15, 2005) and Declaration of Bryce J. Wilcox in Opposition to Insurers' Motion for Partial Summary Judgment Re: Invalidity of the Assignment (docket #178) ("Wilcox Decl."), Ex. J (Dineen Depo., Ex. 15) (named insured effective July 31, 2005). That name change became effective July 31, 2005. AMCO was not advised prior to the name change that the ownership of the Hotel had changed.

In December 2005, Malbco had emergency shoring performed on the Hotel.[2] In June 2006, Malbco tendered another claim for coverage to AMCO and Wausau, both as an insured and as an assignee of Centennial. AMCO and Wausau affirmed their previous denials of coverage on March 14 and September 10, 2007, respectively.

## DISCUSSION

## I. Application of Oregon Law

### A. Legal Standards Governing Choice of Law

The pivotal issue presented in the currently pending motions is whether Oregon law applies to any of Malbco's claims. When exercising jurisdiction based on diversity of citizenship, as here, a federal district court must generally apply the choice of law rules for the state in which it sits. *Patton v. Cox*, 276 F3d 493, 495 (9th Cir 2002); *389 Orange St. Partners v. Arnold*, 179 F3d 656, 661 (9th Cir 1999). Accordingly, this court applies Oregon choice of law principles.

---

[2] Malbco contends that this emergency work was necessitated by a "collapse" of the Hotel as used in the relevant insurance policies. However, that issue has not yet been fully addressed by the parties and must await another round of dispositive motions.

Oregon courts first determine whether a material difference exists between the laws of the competing *fora*: "Before applying the law of one forum rather than another, a court must first 'determine whether the laws of the states having a connection with the controversy are in conflict on the particular issue.'" *Manz v. Cont'l Am. Life Ins. Co.*, 117 Or App 78, 80-81, 843 P2d 480, 481 (1992), *modified on other grounds on recon.*, 119 Or App 31, 849 P2d 549 (1993), *rev. denied*, 317 Or 162, 856 P2d 317 (1993). If there is no material difference in the laws of the respective states, then a "false conflict" exists and Oregon law applies. *Angelini v. Delaney*, 156 Or App 293, 300, 966 P2d 223, 227 (1998), *rev. denied*, 328 Or 594, 987 P2d 514 (1999). If a true conflict is found, Oregon applies a conflicts of laws analysis guided by the RESTATEMENT (SECOND) OF CONFLICTS (1971) ("RESTATEMENT"). *Portland Trailer & Equip. Inc. v. A-1 Freeman Moving & Storage, Inc.*, 182 Or App 347, 358, 49 P3d 803, 809 (2002) (adopting the choice of law rules of RESTATEMENT § 6 and the "most significant relationship" test for tort choice of law set forth in RESTATEMENT § 145 for tort claims); *Manz*, 117 Or App at 82, 843 P2d at 482 (looking to RESTATEMENT § 188 for guidance in resolving choice-of-law issues in contractual disputes).

### B.  <u>True Conflict</u>

Malbco has identified several areas in which Washington and Oregon law conflict. With respect to the First and Third Claims, Malbco notes that Oregon does not recognize a first-party bad faith claim against an insurance company, while Washington does recognize such a claim and has statutorily imposed a duty of good faith on insurers. *Compare Coventry Assocs. v. Am. States Ins. Co.*, 136 Wash 2d 269, 281, 961 P2d 933, 938 (1998) and RCW 48.01.030 *with Farris v. U.S. Fid. & Guar. Co.*, 284 Or 453, 460, 587 P2d 1015, 1018-19 (1978). Malbco also notes a conflict

between Oregon and Washington law concerning the assignment of post-loss claims in the face of an anti-assignment provision. *Compare Holloway v. Republic Indem. Co. of Am.*, 341 Or 642, 147 P3d 329 (2006) *with Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 124 Wash 2d 816, 881 P2d 986 (1994).

With respect to Malbco's Second Claim for violation of Washington's CPA, Malbco points out that Oregon does not recognize nor enforce that statute. Moreover, to the extent that Oregon's Unfair Claims Settlement Practices Act, ORS 746.230, prohibits conduct which would support a claim under Washington's CPA, Oregon courts have decided that violations of that provision are not independently actionable. *See Richardson v. Guardian Life Ins. Co. of Am.*, 161 Or App 615, 623-24, 984 P2d 917, 923, *rev. denied*, 329 Or 553, 994 P2d 129 (1999) (citation omitted). These differences are sufficient to establish a true conflict and require this court to proceed to the next step in Oregon's conflict of laws analysis.

### C. **First and Third Claims – Breach of Contract and Breach of Good Faith**

#### 1. **Characterization of the "Bad Faith" Allegations**

Malbco's First Claim alleges that defendants breached the relevant policies and failed to act in good faith both by denying coverage (including failing to pay repair costs and lost business expenses) and by failing to act within certain time periods, fully investigate, and provide a reasonable explanation when responding to the claims communicated by Centennial and Malbco. Complaint, ¶ 4.4. The Third Claim alleges that defendants breached the duty of good faith and fair dealing based on the same conduct alleged in First Claim and by failing to provide to the insured important information relating to the Hotel and their claim investigation. *Id*, ¶ 4.15.

///

9 - OPINION AND ORDER

As noted above, Oregon's conflict of laws analysis is guided by the RESTATEMENT (SECOND) OF CONFLICTS. Which RESTATEMENT section applies depends in part upon the characterization of the claim as one sounding in tort or contract.

Malbco contends that the portion of its First Claim alleging bad faith and its Third Claim are tort claims which should be analyzed under RESTATEMENT § 145. In Washington, "[a]n action for bad faith handling of an insurance claim sounds in tort." *Safeco Ins. Co. of Am. v. Butler*, 118 Wash 2d 383, 389, 823 P2d 499, 503 (1992). Thus, Washington law would require consideration of the tort conflict-of-laws principles. Oregon, on the other hand, considers the type of breach of duty of good faith and fair dealing claim alleged here to be a contractual claim, not a tort claim:

> The California courts have not, however, made the distinction pointed out here or in *Santilli* but have, without recognition that it was the fiduciary position of the insurer which arises when it represents the insured in litigation which gives rise to the good faith language, transposed the language into cases in which insurance companies have not undertaken representation of the insured at all. As a result, they have held an action in tort can lie for the breach of contract.
>
> \*            \*            \*
>
> Contrary to the California holdings, for the reasons given in *Santilli*, we believe defendant's failure to undertake representation of plaintiffs which required them to represent themselves could only have been a breach of contract, and in cases of breach, the law is clear that no recovery for mental distress because of threat of pecuniary loss is recoverable.

*Farris*, 284 Or at 464-65, 587 P2d at 1021, citing *Santilli v. State Farm Life Ins. Co.*, 278 Or 53, 60-63, 562 P2d 965, 968-70 (1977) (remaining citations omitted); *see also Warren v. Farmers Ins. Co. of Oregon*, 115 Or App 319, 326, 838 P2d 620, 624 (1992), *rev. denied*, 316 Or 529, 854 P2d 940 (1993) ("*Farris* dictates [that] . . . [i]f an insurer does not defend a claim, and thereby breaches its contract with the insured, its liability, if any, is only for breach of contract, not for a

tort."); *Employers' Fire Ins. Co. v. Love It Ice Cream Co.*, 64 Or App 784, 792, 670 P2d 160, 165 (1983) ("an insurer's bad faith refusal to pay policy benefits to its insured sounds in contract and is not an actionable tort in Oregon").  Accordingly, the First and Third Claims must be analyzed under the conflict-of-laws principles applicable to contracts.

### 2. RESTATEMENT § 193

The parties discuss a number of RESTATEMENT sections in their briefing.  However, this court is persuaded that RESTATEMENT § 193 is determinative and dictates that Oregon law controls the analysis of the First and Third Claims.  That section provides as follows:

> Contracts Of Fire, Surety Or Casualty Insurance
>
> The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

This provision requires a two-part analysis.  First, the "state which the parties understood was to be the principal location of the insured risk" must be identified.  The local law of that state will apply "*unless* with respect to the particular issue, some other state has a more significant relationship under the principles stated in [RESTATEMENT] § 6 to the transaction and the parties." RESTATEMENT § 193 (emphasis added).

Comment a to RESTATEMENT § 193 recognizes that – in the case of movable objects – there may be no "principal location" of the insured risk, which will require application of the factors identified in RESTATEMENT § 188:

> There may be no principal location of the insured risk in the case of contracts for the insurance of things, such as ships, trucks, airplanes and railroad cars, that are constantly on the move from state to state. In such a case, the location of the risk can play little role in the determination of the applicable law.  The law governing insurance contracts of this latter sort must be determined in accordance with the principles set forth in the rule of § 188.

In contrast, where the insured risk is an "immovable" object principally located in a single state, the location of the insured risk is "given greater weight than any other single contact in determining the state of the applicable law. . . . The importance of the risk's principal location . . . enjoys greatest significance when an immovable is involved, such as when the risk insured against is damage by fire to a particular building."  RESTATEMENT § 193, comment b.

The "insured risk" in this case is a hotel located exclusively within the boundaries of Oregon.  All other relevant documentary evidence in the record indicates that the contracting parties understood that Oregon would be the "principal location of the insured risk during the term of the policy."  The Centennial/Hospitality Management Contract required that all policies of insurance obtained by Hospitality on behalf of Centennial "be issued by financially sound insurance companies qualified to do business in the State of Oregon."  Rogers Decl., Ex. 6, p. 8. The Day Island/Hospitality Management Contract contained the identical provision requiring the purchase of insurance from companies qualified to do business in the State of Oregon.  *Id*, Ex. 8, p. 7.  In addition, the Wausau Policy was issued on numerous forms with "Oregon" in their title. These are statutory forms approved for use in the state of Oregon and which Wausau only uses to write coverage for property in Oregon.  Because it insured an Oregon hotel, the Wausau policy's premiums were rated for Oregon (*i.e.*, premiums were based on Oregon rates).  Similarly, the

AMCO Policies included an Oregon Amendatory Endorsement and were rated for the State of Oregon. Rogers Decl., Ex. 1 pp. 14, 102-04, and Ex. 3 (Simoni Decl.), ¶¶ 5, 9.

Based on the situs of the insured risk (the Hotel), as well as the objective evidence that the relevant insurance policies were written with Oregon insurance law in mind, this court concludes that the record will support no other conclusion than that the contracting parties understood the principal location of the insured risk would be Oregon.

### 3. **Other RESTATEMENT Factors**

RESTATEMENT § 193 does have some wiggle room by allowing the application of the local law of a state that is not the principal location of the insured risk when that state "has a more significant relationship under the principles stated in § 6 to the transaction and the parties" with respect to the particular issue. RESTATEMENT § 6 in turn identifies the following factors to consider in making that determination:

> (a) the needs of the interstate and international systems;
> (b) the relevant policies of the forum;
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;
> (d) the protection of justified expectations;
> (e) the basic policies underlying the particular field of law;
> (f) certainty, predictability and uniformity of result; and
> (g) ease in the determination and application of the law to be applied.

RESTATEMENT § 188(2) identifies the following "contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue" and specifies that the "contacts are to be evaluated according to their relative importance with respect to the particular issue:"

///

(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicile, residence, nationality, place of incorporation and
place of business of the parties.

This court agrees that these factors, evaluated in the context of contracts providing insurance coverage for property located exclusively within the state of Oregon, and evaluated in light of all other evidence in the record, all point to the application of Oregon law. In particular, this court agrees with and incorporates by reference those arguments advanced by Wausau and AMCO in their memoranda on the subject. *See* AMCO's Memorandum in Support of Motion for Summary Judgment (docket #109), pp. 10-12; Wausau's Memorandum in Support of Motion for Partial Summary Judgment Re: Application of Oregon law (docket #114), pp. 9-12; AMCO's Reply Brief in Support of Motion for Summary Judgment (docket #143), pp. 4-6, 9-12; and Wausau's Reply in Support of Motion for Partial Summary Judgment Re: Application of Oregon Law (docket #145), pp. 3-9. In light of all of the factors therein identified, this court concludes that Oregon law governs the First and Third Claims.

### D.  <u>Second Claim – Washington Consumer Protection Act</u>

Malbco's Second Claim for violation of the Washington CPA is premised upon the same allegedly wrongful conduct as alleged in the First Claim, plus the additional allegation that defendants "wrongfully with[held] information from the insured." Complaint, ¶¶ 4.4, 4.8. As just discussed, Oregon law applies to the contractual issues in this case, both because the principal location of the insured risk is within Oregon and because the other factors identified in RESTATEMENT §§ 6 and 188 also point to the application of Oregon law.

Oregon law prohibits certain unfair claim settlement practices, including several of the practices alleged by Malbco in the Second Claim. *See* ORS 746.230(1). Washington allows individual insureds to bring claims for those types of practices under RCW 19.86.020. *Indus. Indem. Co. of the Nw., Inc. v. Kallevig*, 114 Wash 2d 907, 920-21, 792 P2d 520, 528 (1990) (*en banc*). In contrast, Oregon does not allow independent claims for violations of ORS 746.230. *Richardson*, 161 Or App at 623-24, 984 P2d at 923.

At oral argument, Malbco suggested that a traditional conflict of laws analysis does not apply to the Second Claim, and that the issue instead is whether Malbco is within the class of persons the CPA is designed to benefit. Citing RESTATEMENT § 6, Comment b, Malbco contends that this court must "apply a local statute in the manner intended by the legislature even when the local law of another state would be applicable under the choice-of-law principles." Even so, that requirement does not undercut the traditional conflict-of-laws analysis. Indeed, the remaining text of the Comment simply notes that the usual situation will be a statute not explicitly directing application of a particular state's local law, and underscores the need to discern the intended "range of application" of the statute "by a process of interpretation and construction:"

> The court should give a local statute the range of application intended by the legislature when these intentions can be ascertained and can constitutionally be given effect. If the legislature intended that the statute should be applied to the out-of-state facts involved, the court should so apply it unless constitutional considerations forbid. On the other hand, if the legislature intended that the statute should be applied only to acts taking place within the state, the statute should not be given a wider range of application. . . . When the statute is silent as to its range of application, the intentions of the legislature on the subject can sometimes be ascertained by a process of interpretation and construction. Provided that it is constitutional to do so, the court will apply a local statute in the manner intended by the legislature even when the local law of

another state would be applicable under usual choice-of-law principles.

The Second Claim alleges that defendants committed unfair acts or practices under the Washington CPA by failing to:  (1) act within certain time periods after being notified of claim(s); (2) fully investigate; (3) provide a reasonable explanation of their decisions; and (4) provide Malbco important information relating to the Hotel and their claim investigation.  Without exception, these allegations assert that defendants did not meet Washington's statutory obligations relative to an immovable insured risk located entirely outside of Washington's borders with respect to insurance policies issued in Oregon.  When evaluating contacts in a conflicts of laws analysis, Oregon courts "look to those that show that the *state* has some interest in having its law apply to the dispute [and is] not concerned with the subjective desires of the parties."  *Manz*, 117 Or App at 83, 843 P2d at 483 (emphasis added).  Thus, this court must ascertain Washington's interest in having its law apply and not the subjective desires of Malbco, AMCO, or Wausau.

Washington, like Oregon, has a comprehensive statutory scheme regulating the provision of insurance found in RCW Ch. 48.  It has engrafted portions of that statute onto the CPA, allowing claims for certain failures under Washington insurance law to also constitute a claim for violation of the CPA.  *Kallevig*, 114 Wash 2d at 924-25, 792 P2d at 530.  As discussed above, Oregon follows the rule that the "validity of a contract of fire, surety or casualty insurance *and the rights created thereby* are determined by the local law of the state which the parties understood was to be the principal location of the insured risk."  RESTATEMENT § 193 (emphasis added).  Although the Second Claim is a statutory – as opposed to contractual – claim, it is premised upon the existence of the insurer-insured relationship created by the insurance polices.  Each of the specifications of a violation of the CPA reflects this relationship by asserting that defendants

failed in some way to live up to their obligations under the relevant insurance policies by failing to properly respond to, investigate, or process claims filed by Malbco under the policies.  In that sense, the CPA claim is a subset of rights created by virtue of the insurance relationship.  Absent that relationship, Malbco would have no insurance claim to process and, therefore, could not successfully sue defendants for violating the CPA premised upon those deficiencies.  In short, it is the relationship created by the insurance policies that gives Malbco's "rights" under the CPA. Thus, for the same reasons discussed above, RESTATEMENT § 193 would seem to dictate application of the same law to the CPA claim as to the contractual claims.

In any event, applying the law with the most significant relationship to the transaction and the parties would likewise dictate the application of Oregon law.  Framed in the context of a conflicts-of-laws inquiry under RESTATEMENT §§ 6 and 193, the issue is whether Washington has a more significant relationship than does Oregon to the processing of Malbco's claims for the alleged collapse at the Hotel and to the parties involved in those transactions, with respect to ensuring the kinds of claims processing behaviors which both states' laws seek to promote.  Both states have comprehensive laws regulating the provision of insurance and have enacted statutes seeking to promote fairness in claims processing.  Oregon has opted to leave the enforcement of those laws to the state Insurance Division, while Washington has opened the door to private actions by disgruntled insureds.  Thus, the basic policies underlying the field of law at issue do not differ.  The only difference is in each state's conclusion about the efficacy or equity of differing enforcement mechanisms.

Malbco's argument places heavy emphasis on its expectation of receiving the benefit of Washington's consumer-oriented law based on the fact that Malbco is incorporated in, and sent its

claims from, Washington.  However, other than the initiation of the claim in Washington, nothing

else points toward Washington having a relationship with the transaction or the parties.  Wausau

(incorporated in Wisconsin) investigated the claims in Oregon and made claim-handling and

coverage decisions in California.  Wausau's Concise Statement of Material Facts on Motion for

Partial Summary Judgment Re: Application of Oregon Law (docket #115), ¶ 12 (not disputed by

Malbco per docket #133, ¶ 12); Sotirhos Decl., Ex. 5 (Thompson Decl.), ¶¶ 1-2.  After receiving

the 2004 claim, AMCO (incorporated in Iowa) assigned an Oregon adjuster, investigated in

Oregon, retained experts in Oregon to assist in investigating the claim, and made coverage

decisions in Colorado.  Rogers Decl., Ex. 4 (Scott Decl.), ¶¶ 1, 3-4, 8.  Malbco sent its June 14,

2006 letter (providing AMCO with an "update" on the 2004 claim and notifying AMCO that the

"hotel had begun to actually collapse") to an AMCO representative *in Oregon*.  Rogers Decl.,

Ex. 4 (Smith Decl.), Ex. B.  In short, the record reflects that the lion's share of the relevant

transaction (*i.e.* the processing of Malbco's claims) took place in Oregon where the Hotel is

located.  This is particularly true of the investigatory portion of the transaction at which the bulk

of Malbco's CPA claim is directed.

Similarly, Oregon has a substantial relationship with the parties to the transaction.  The

insured risk (the Hotel) is located in Oregon, and the insurance policies were crafted to comply

with Oregon law by companies doing business in Oregon.  Multiple other states (Washington,

Iowa, Wisconsin, California, Colorado) have interests in the transaction varying in weight given

their status as the locations of corporate headquarters or regional claims offices.  However, the

contacts and interests of those again tie back to Oregon, the location of the Hotel and the central

hub of the claims processing activities.  Those states' interests in determining the extent of

compliance by Wausau and AMCO with laws designed to insure speedy and fair claims processing pale in comparison to the relative interest of Oregon.  The Hotel, the policies that insured it, and the investigatory processes that formed the basis for the coverage decisions all point to Oregon having the most significant relationship with the transaction and the parties. While Washington has chosen a different means of ensuring the expeditious and equitable processing of insurance claims, neither that decision nor Washington's interest in protecting its insureds outweigh Oregon's significant relationship to the particular transaction and parties before this court.  Accordingly, Oregon law also applies to the Second Claim, the thrust of which is to penalize defendants for falling short on their duties to expeditiously and equitably process Malbco's insurance claims.

## II.  **Second Claim**

As discussed above, Oregon has no statutory counterpart to the Washington CPA and, to the extent it prohibits the same conduct, disallows individual claims for violations of good faith. Thus, Malbco's Second Claim for violation of the Washington CPA is not cognizable under Oregon law.  Accordingly, AMCO and Wausau are entitled to summary judgment against the Second Claim.

## III.  **Third Claim**

Because Malbco initially filed this case in Washington state court under Washington law, it alleged separate claims for breach of contract and breach of the duty of good faith and fair dealing.  As discussed above, Oregon does not recognize a tort claim against an insurer for breach of a duty of good faith and fair dealing.  Instead, any claim for breach of good faith is incorporated into a breach of contract claim for failing to provide insurance coverage.  Not being a separately

cognizable claim under Oregon law, the Third Claim for breach of good faith and fair dealing is

redundant and simply duplicates the First Claim by alleging a breach of contract.  Accordingly,

AMCO and Wausau are entitled to summary judgment against the Third Claim.

## IV.  <u>Anti-Transfer Clause</u>

Malbco not only purchased the Hotel from Centennial, but also purchased "[a]ll claims,

including claims against contractors, insurance proceeds, and causes of action dealing with any

and all damage to the Property, including, without limitation, claims relating to the water loss

more particularly described within section 8."  First Amendment to PSA, § 1.2.8.  Centennial also

"fully assign[ed]" to Malbco all of Centennial's "right, title, and interest to any and all policies of

insurance in which [Centennial] has an interest relating to the Property, including . . . all insurance

policies that may provide coverage for damage to the Property."  *Id*, § 8.

All policies at issue contain an anti-transfer provision which states: "Your rights and

duties under this policy may not be transferred without our written consent except in the case of

death of an individual named insured."  Sotirhos Decl., Ex. 6, p. 2 (Wausau Policy);  Rogers

Decl., Ex. A., p. 82 (AMCO Policy).  Because Centennial never obtained defendants' consent to a

transfer of its "rights and duties" under the policies, defendants argue that the purported

assignment is unenforceable.  Malbco responds with a variety of arguments, each of which this

court addresses in turn, but ultimately none provide Malbo with the affirmation of its assignment

it seeks.  As a result, Wausau is entitled to summary judgment against the First Claim in its

entirety, and AMCO is entitled to summary judgment against the First Claim premised upon the

policies issued to Centennial prior to July 31, 2005.

///

A.  **Delivery of Policies**

As a threshold issue, Malbco contends that the anti-transfer clause is not enforceable

because the policies containing that clause were never delivered to the named insureds.  Once all

conditions to coverage have been satisfied by the insured, Oregon law requires that "every policy

shall be mailed or delivered to the insured or to the person entitled thereto within a reasonable

period of time after its issuance . . . ."  ORS 742.046.  Malbco contends that, at least with respect

to AMCO, the policy produced to Centennial in May 2005, about three months before its sale of

the Hotel to Malbco, is the relevant policy.  Furthermore, Malbco cites testimony by various

representatives of Centennial, Malbco, and Hospitality to the effect that they never received a

copy of an insurance policy from AMCO or Wausau as proof positive that the insurers cannot rely

on the anti-assignment provision.  These arguments ignore the context of the May 2005

transmittal of portions of AMCO's policy and too narrowly construe the role of insurance agents

and brokers.

William Dinneen ("Dinneen"), was employed by Seabury & Smith / Marsh McLennan

d/b/a/ Marsh Advantage America ("Marsh") as an insurance agent.  Rogers Reply Decl., Ex. 1

(Dinneen Depo.), pp. 11-13.  Marsh acted as the insurance agent for both Centennial and Malbco

with respect to the Hotel.  *Id*, pp. 47, 49, 54; Declaration of Maria E. Sotirhos in Support of

Wausau's Reply in Support of Motion for Partial Summary Judgment Re: Invalidity of

Assignment (docket #183) ("Sotirhos Reply Decl."), Ex. 1 (Dinneen Depo.), pp. 144-45.  Upon

initial issuance, Wausau and AMCO would deliver the full policy to Marsh.  *Id*, pp. 151, 197.

Between 2000 and 2003, Marsh's practice was to mail or hand-deliver the policy received from

Wausau and AMCO to the policyholder.  *Id*, pp. 64-65, 124.  After Dinneen acquired the Malbco

account in 2004 and subsequently from 2004-05 forward, Marsh transmitted a full copy of its

policy to the insured at the time of policy renewal in May of each year. *Id*, pp. 196-97. Dinneen

either hand-delivered or mailed the policies to the insured. *Id*, pp. 204-05.

Where a policy is delivered by the insurer to its agent for unconditional delivery to the

insured, it is "tantamount to a delivery to the insured." *Morford v. Cal. W. States Life Ins. Co.*,

166 Or 575, 588, 113 P2d 629, 635 (1941) (citation omitted); *see also Krause v. Wash. Nat'l Ins.

Co.*, 255 Or 446, 460, 468 P2d 513, 520 (1970) (*en banc*) ("the unconditional delivery of a policy

by an insurance company to the agent of the insured, including a broker representing the insured,

is also sufficient to constitute delivery, where delivery is required."). Therefore, delivery of the

policies by defendants to the insured's agent (Marsh) constituted delivery of the policies to the

insured.

Contrary to Malbco's contention, the delivered copies of the policies to the insurance

agent included the anti-transfer clause. In May 2005, pursuant to the request of Malbco's

attorney, Marsh transmitted portions of the AMCO and Wausau policies. Dinneen Depo.,

pp. 147-49, 200-01 & Ex. 23. The transmittal was not at the time of renewal and Marsh

transmitted only those portions of the policies that it thought were relevant to the claimed property

loss. *Id*, pp. 192-93. Consequently, Malbco's non-delivery argument fails.

### B.  **Validity of the Anti-Transfer  Clause**

Malbco also contends that the anti-transfer clause does not bar a post-loss transfer of

insurance coverage. Were this court writing on a blank slate, it would be inclined to agree with

Malbco and the majority of jurisdictions addressing this issue. However, Oregon law dictates a

contrary conclusion.

In *Holloway*, the Oregon Supreme Court enforced a virtually identical anti-assignment provision. In that case, as part of a settlement, the insured purported to assigned to Holloway all of her rights to any claim she might have against Republic, her insurer. Republic did not consent to the assignment. The court upheld the court's dismissal of Holloway's claim against Republic based on the following anti-assignment clause in the policy: "Your rights or duties under this policy may not be transferred without our written consent." *Id* at 645, 147 P2d at 331.

Malbco seeks to distinguish *Holloway* on several grounds. First, it explains that the transfer from Centennial occurred after the loss, after Centennial tendered the claim to defendants, and after defendants denied the claim. By that time, Centennial had already complied with its duties under the policies to claim coverage for the loss. As a result, Malbco asserts that the anti-transfer provision, which requires written consent for "rights *and* duties," is inapplicable because Centennial did not seek to transfer any *duties* to Malbco. In essence, this argument urges adoption of a rule allowing a post-loss assignment because it involves only an assignment of rights, not duties.

*Holloway* expressly rejected that argument by refusing to treat post-loss assignments differently because they assign a "vested right" under the policy. Instead, it held that all assignments made in violation of the policy language have no legal effect in Oregon:

> The anti-assignment clause here is worded broadly; it contains no exception or qualifications. It explicitly prohibits, without Republic's written consent, the assignment of "[y]our [the insured's] rights or duties under this policy[.]" According to those terms, the clause applies to whatever rights or duties the insured may have under the policy. Nothing in the clause suggests a limitation to pre-loss rights or duties or provides an exception for post-loss rights or duties. Reading such an exception into the policy would not be reasonable and would "insert what has been omitted."

*Id* at 651-52, 147 P3d at 334.

23 - OPINION AND ORDER

In *Alexander Mfg., Inc. v. Ill. Union Ins. Co.,* 2007 WL 2462644 (D Or Aug. 27, 2007),
this court interpreted an anti-assignment provision that prohibited assignment of "interests" and
held the term "'interest' *includes* the term 'rights *and* duties'" and is sufficiently "*similar* to the
anti-assignment clause in *Holloway*" which prohibited assignment of "rights *or* duties."  The court
noted that "insurance contracts frequently include the words together as 'interests, rights and
duties.'  Often, the words are used interchangeably.  Nothing in the definition of 'interest' limits
its application . . .  to pre-loss assignments." *Id* at *5.  Thus, *Alexander* treated "interests," "rights
and duties" and "rights or duties" as functional equivalents.

Based on *Holloway* and *Alexander*, whether an assignment addresses "interests," "rights
and duties," or "rights or duties," Oregon law does not carve out exceptions for post-loss
assignments in contravention of clear policy language.  These cases strip Centennial's assignment
of any legal effect under Oregon law.

Furthermore, Centennial assigned Malbco both rights *and* duties.  The First Amendment to
the PSA provides that:  "Seller hereby fully assigns to Buyer all of its right, title, and interest to
any and all policies of insurance."  This was not simply a claim assignment, but was a policy
assignment.  The policy imposes rights and duties on both parties to the contract, and any
assignment of all of the insured's "right, title, and interest" in the policy necessarily must include
both.

Malbco further argues that defendants would not be prejudiced by allowing it to bring the
claim as the assignee of Centennial.  However, Malbco cites no Oregon case law requiring a
showing of prejudice to invalidate the assignment.  This court need not belabor the relative merits

of enforcing or refusing to enforce the assignment because evidence of prejudice simply is not part of the showing defendants must make.[3]

Malbco also asserts that any decision on the assignment issue is premature because defendants forfeited their right to rely on the anti-transfer clause by breaching the insurance contracts before the assignment by wrongfully denying coverage for the loss. This argument suffers from a fatal flaw. Malbco has no standing to raise the issue of an alleged breach by defendants until it acquired an insurable interest. The only party who could make a claim under the policies prior to July 31, 2005, was Centennial.[4] Defendants could not breach the policy as to Malbco prior to Malbco succeeding Centennial's interest as an assignee. *See* ORS 742.011 ("No policy of insurance of property or of any interest in property or arising from property shall be enforceable as to the insurance except for the benefit of persons having an insurable interest in the things insured as at the time of the loss.") In other words, until the assignment occurred, Malbco was a stranger to the policies with no contractual rights, express or implied. Whether or not defendants breached the insurance contracts prior to the assignment, only the named insured can pursue that claim. Malbco had no insurable interest until it became a named insured.

Therefore, the anti-transfer clause in the policies is valid and enforceable with respect to a post-loss transfer.

### C. Lack of Consent

At the time the sale of the Hotel to Malbco closed in August 2005, no one had asked Wausau or AMCO to consent to the policy transfer. After Malbco filed suit on October 24, 2007,

---

[3] In any event, AMCO has proffered numerous reasons why it would be prejudiced by the transfer.

[4] As an additional named insured, Hospitality also would have the right to make a claim under the policies.

and after defendants moved for summary judgment in August 2008 based on lack of written

consent to the policy transfer, Centennial first asked Wausau and AMCO to consent to the transfer

by letter dated August 25, 2008.  Wilcox Decl., Ex. 1 (Dinneen Depo., Ex. 27).  AMCO and

Wausau denied the request on October 8 and November 5, 2008, respectively.  Declaration of

Terry P. Wynia (docket #175), Ex. A; Sotirhos Reply Decl., Ex. 3.

Centennial's request was untimely.  The policies clearly prohibit assignment without

written consent of the insurers.  Centennial made the assignment without first obtaining

defendants' consent.  Malbco argues that the policies do not specify a date by which an insured

must request the insurer's consent to the transfer.  However, under any possible interpretation of

the policy language, it is untimely to request consent more than three years after the assignment

has occurred and after the parties are embroiled in litigation on the legal effect of the assignment.

Otherwise, the anti-transfer clause would be completely emasculated.

Malbco seeks to avoid this result by arguing that requesting consent to the assignment

would have been futile.  The evidence reveals that AMCO *never* consents to transfers, whether

pre- or post-loss.  The evidence is less clear as to Wausau.  Although its representative testified

that, based on his "experience," he had not and would not grant a post-loss request for transfer, he

also testified that from the perspective of Wausau, he would "never say never."  Sotirhos Reply

Decl., Ex. 2 (Black Depo.), pp. 48-49.  As a result of this unwritten "no consent" practice, Malbco

accuses defendants of breaching implied covenant of good faith and fair dealing which precludes

reliance on the anti-transfer clause.

///

///

26 - OPINION AND ORDER

Again, Malbco has no standing to raise the issue of an alleged breach of good faith based on an insurer's practice of never consenting to requests for assignment. The only party who could request an assignment of the policies is the insured, Centennial. Similarly, the only party who could claim a breach of the duty of good faith arising from a denial of its request for assignment prior to July 31, 2005, is Centennial. Defendants could not breach any duty of good faith and fair dealing to Malbco prior to Malbco succeeding Centennial's interest as an assignee. In other words, Malbco may not rely on an assignment that did not yet exist to create a duty of good faith that it was never owed to create the assignment that never existed.

### D.  Conclusion

This court concludes that the anti-transfer clauses in the policies are valid and enforceable under Oregon law as to a post-loss transfer and that neither defendant consented to the transfer of the policies from Centennial to Malbco. Malbco's claims against Wausau are entirely dependent upon the validity of the assignment contained in the PSA. Similarly, Malbco's claims against AMCO prior to July 31, 2005, are dependent upon the validity of that assignment. As a result, Malbco cannot pursue any breach of contract claim against Wausau and can pursue AMCO for breach of contract only on those policies issued by AMCO to Malbco commencing July 31, 2005.

## V.  Statute of Limitations

AMCO's policy contains a two-year contractual claim limitation period. Rogers Decl., Ex. 1, p. 103 (Oregon Amendatory Endorsement), ¶ F(3)(b) (any suit must be "brought within 2 years after the date on which the direct physical loss or damage occurred."). Malbco filed this suit on October 24, 2007. AMCO argues that Malbco's breach of contract claim is barred because it was filed more than two years after the loss or damage occurred.

Malbco's attempt to apply Oregon's six year statute of limitation for contract actions, ORS 12.080, is unavailing. ORS 12.080 does not apply to actions on a contract "mentioned in . . . ORS 12.110" which, in turn, does not apply to actions "where a different limitation is prescribed by statute." Here, ORS 742.240 prescribes a different limitation period.

Pursuant to ORS 742.240, a fire insurance policy must contain a provision requiring a suit or action to be "commenced within 24 months next after inception of the loss." This statute also applies generally to property insurance policies even if a fire did not cause the damage at issue. *See, e.g.*, *Hatley v. Truck Ins. Exch.*, 261 Or 606, 494 P2d 426 (1972) (applying provision where insured sought property insurance proceeds for water damage); *Herman v. Valley Ins. Co.*, 145 Or App 124, 126 n1, 928 P2d 985, 987-88, n1 (1996) (applying provision to homeowners policy for property loss resulting from burglary).

The statutory phrase "inception of the loss" means the occurrence of the casualty insured against, not the accrual of liability. Oregon has "aligned itself with the majority of jurisdictions . . . which interpret the phrase 'inception of the loss' in the standard fire insurance policy to mean 'the occurrence of the casualty or event insured against.'" *Moore v. Mut. of Enumclaw Ins. Co.*, 317 Or 235, 247, 855 P2d 626, 633 (1993), quoting *Bell v. Quaker City Fire & Marine Ins. Co.*, 230 Or 615, 624, 370 P2d 219, 224 (1962). Thus, under the statute, suit must be brought within two years of the occurrence of the property damage at issue. *Id* at 250, 855 P2d at 635.

Unlike the statute, AMCO's policy does not use the phrase "inception of the loss," but instead refers to when "the direct physical loss or damage occurred." The policy does not define either "physical loss" or "damage." For purposes of this motion, it is not necessary to define those

terms since both parties agree that the Hotel suffered either a "physical loss" or "damage." Rather, the disputed issue is when that "physical loss" or "damage" occurred.

AMCO posits that the loss or damage occurred sometime before February 12, 2004, when Centennial first notified AMCO of the water damage. By the time Malbco bought the Hotel, AMCO had denied coverage for this water damage. As Malbco expressly acknowledged in the First Amendment to the PSA in March 2005, it was aware of the existence of water damage on the property, although it did not know the full extent of damage. Thus, to the extent that Malbco's breach of contract claim is based on a denial of coverage for the 2004 water damage, its breach of contract claim is barred by the statute of limitations.

Alternatively, Malbco premises its claim on a denial of coverage for the "collapse" of the Hotel which Malbco contends did not occur until late 2005. Even if the "collapse" occurred in late 2005, AMCO responds that, based on Malbco's own evidence, the loss occurred prior to October 24, 2005, outside the two year limitations period.

AMCO first points to the report of Wausau's expert, James R. Perrault at JRP Engineering, Inc., who opined that the "substantial structural impairment" occurred in the 2002-03 time frame. However, the expert does not expressly opine as to when a "collapse," as defined by the policy, occurred, and other evidence indicates a deterioration over time and well after 2003. Therefore, his opinion is not the equivalent of an admission that a "collapse" occurred prior to October 24, 2005.

Second, AMCO relies on a declaration by James Mulloy, a managing member of Malbco, who observed for the first time "both in September 2005 and October 2005," a number of structural problems in the pool room, bike room, third floor hallway, third floor guestroom, and

second floor guestroom.  Declaration of James S. Mulloy in Opposition to Defendants' Motions for Summary Judgment (docket #135), ¶ 4.  AMCO reads too much into Mulloy's statement.  It is far from clear whether the conditions Mulloy observed would constitute a "collapse" under the policy.  Furthermore, his statement is vague as to when he observed each of these conditions.  He may have observed some of the conditions in September, some early in October, or most after the key date of October 24, 2005.  At this juncture, his statement is insufficient to prove that the collapse occurred more than two years prior to filing of the suit.

Although this fact issue precludes summary judgment, Malbco raises another issue that could obviate the need to determine when the loss occurred.  Malbco claims that the statute of limitations should be tolled by the nearly nine month period of time taken by AMCO to investigate and finally deny Malbco's claim for coverage.  In other words, even if the claim accrues on the date of the loss pursuant to the plain language of the policy, Malbco argues that it runs only until the claim is submitted to the insurer.  At that point, according to its theory, the limitations period is tolled during the period of the insurer's investigation and begins to run again only after the insurer denies the claim.

Neither the parties nor the court have found any Oregon case deciding whether a limitations provision in an insurance policy may be tolled while an insurer investigates a claim.  A minority of courts have used the concept of tolling to enlarge time limitations in an insurance contract, while a majority of courts have refused to toll a limitation provision during the initial non-suit period or during the insurer's investigation.  *FDIC v. Hartford Acc. and Indem. Co.,* 97 F3d 1148, 1150 (8th Cir 1996) (citing cases).

In Oregon, the expiration of a statute of limitations may be tolled in certain circumstances. For example, the doctrine of adverse domination tolls the running of the statute of limitations for negligence and breach of fiduciary duty claims. *FDIC v. Smith*, 328 Or 420, 426-27, 980 P2d 141, 144-45 (1999). A statute may also toll a limitations period. Oregon applies ORS 12.155, which tolls a limitations period when advance payment is made without notice of the expiration of the limitation period, to the limitations period for fire policies in ORS 743.660 (renumbered in 1989 as ORS 742.240). *Ben Rybke Co. v. Royal Globe Ins. Co.*, 293 Or 513, 651 P2d 138 (1982). This case does not present any of those circumstances.

Although no Oregon case can be found on point, Oregon does have a statute which addresses the legal consequences of investigating an insurance claim. According to ORS 742.056, certain conduct by an insurer does not "constitute a waiver of or estoppel to assert any provision of a policy or of any defense of the insurer thereunder," namely acknowledging receipt of a claim, furnishing forms, and "[i]nvestigating any loss or claim under the policy or engaging in negotiations looking toward a possible settlement of any such loss or claim." If such conduct by an insurer cannot waive or estop a limitations period, then it certainly cannot toll the limitations period which would accomplish the same result.

If the insurer is responsible in some other way for the insured's failure to comply with time limitations, then the insured can resort to the traditional principles of waiver and estoppel to obtain adequate relief without doing violence to the plain language of the insurance contract or ORS 742.056. However, Malbco has neither pled nor proven the elements of either waiver or estoppel.

Waiver requires the intentional relinquishment of a known right.  *Moore*, 317 Or at 241, 855 P2d at 629 (citation omitted).  AMCO's policy provides that the policy's "terms can be amended or waived only by endorsement by us and made a part of the policy."  Rogers Decl., Ex. 1, p. 80 (Premier Business Owners Common Policy Conditions, ¶ B(3)).  This provision is required as part of the policy by ORS 742.222.  Malbco does not claim and has presented no evidence of a written waiver added to the policy by an endorsement.

Estoppel requires that the defendant make a false representation with knowledge of the facts, that the plaintiff be ignorant of the truth, and that the plaintiff justifiably and reasonably rely on the representation.  *See Herman*, 145 Or App at 133-34, 928 P2d at 991.  Malbco does not claim and has presented no evidence that it could not have filed suit or was prevented from filing suit within the two-year period due to any false representation by AMCO about the limitations period or any other policy provision.

As explained by the Oregon Court of Appeals, the statutory limitations periods "enable an insurer to fix its present and future liabilities and to close stale claim files.  Without such a limitation provision, an insurer could not accurately forecast its future liabilities, set aside proper reserves, or close even ancient claim files."  *Id* at 132-133, 928 P2d at 991 (citations omitted).  Considering the purpose of suit limitation provisions, there is no legal basis or policy rationale for applying tolling to the limitations provision in AMCO's policy.

As a result, Malbco's breach of contract claim is barred as to a loss which occurred prior to October 24, 2005.  However, issues of fact preclude a determination at this point as to when that loss occurred.

///

32 - OPINION AND ORDER

## VI.  **"Known Loss" Doctrine**

AMCO also contends that Malbco is prevented from bringing a claim due to the "loss in progress," "known risk," or "known loss" doctrine which "disallows coverage where the loss to be insured is in progress or substantially likely to occur when the insurance contract is issued." *City of Corvallis v. Hartford Acc. & Indem. Co.*, 1991 WL 523876 (D Or May 30, 1991).  Although Oregon courts have not expressly adopted this doctrine, this court has applied it to an Oregon insurance policy.  *Id*.  In addition, although not referencing the doctrine by name, the Oregon Court of Appeals has expressly declined to declare a credit life insurance policy void on the basis of the insured's knowledge of his own terminal illness at the time the policy issued.  *See Commercial Bankers Life Ins. Co. v. Kirk*, 66 Or App 359, 364-65, 675 P2d 1069, 1072 (1984).  Based on the decision in *Kirk*, the Ninth Circuit – in an unpublished 1995 decision – found that Oregon courts would align themselves with those jurisdictions which only allow use of the known loss doctrine to invalidate coverage where the insurer shows that the insured fraudulently misrepresented or concealed a material fact:

> In *City of Johnstown, N.Y. v. Bankers Standard Ins. Co.*, 877 F2d 1146 (2nd Cir 1989), the Court of Appeals for the Second Circuit held that, absent a showing that the insured fraudulently misrepresented or concealed a material fact, knowledge on the part of the insured of a risk of loss would not render the policy void because there was no proof that New York law recognized the known risk/known loss defense.  877 F2d at 1152-53.  In *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill2d 90, 607 NE2d 1204 (1992), the Supreme Court of Illinois held that, "If the insured knows or has reason to know, when it purchases a . . . policy, that there is a substantial probability that it will suffer or has already suffered a loss, the risk ceases to be contingent and becomes a probable or known loss." 154 Ill2d at 103, 607 NE2d at 1210.
> * * * While there is no Oregon authority explicitly recognizing or rejecting the known risk/known loss defense, we conclude that the Oregon

> courts would find the reasoning of *City of Johnstown* to be more persuasive
> than that of *Outboard Marine* and closer to the spirit of *Kirk.*

*Generali v. U.S. Branch v. Bank of Montreal*, 46 F3d 1141 (9th Cir 1995) (Table, text in

WESTLAW, NO. 92-26689).

AMCO claims that the loss at issue here was not fortuitous, but had occurred or was

already in progress when AMCO named Malbco as an insured on its policy effective July 31,

2005.  It points out that Centennial not only knew of the water damage, but made a claim for that

damage under its policy in 2004.  AMCO denied that claim before Malbco bought the Hotel and

became a named insured under the AMCO policy on July 31, 2005.  In the First Amendment to

the PSA, Malbco acknowledged that there was "known water damage," although it did not know

the "full extent of the damage."

At oral argument on these motions, Malbco emphasized that its claims are premised not on

the water damage that took place prior to its purchase of the Hotel, but on the collapse that it

contends occurred after it purchased the Hotel in August 2005.  Malbco acknowledges that it

knew of some water damage to the Hotel prior to its purchase, the extent of which it anticipated

was in the $20,000-55,000 range.  Mulloy Second Decl., ¶¶ 2-5.  However, Malbco denies having

any knowledge of an imminent collapse at that time and contends that the collapse was caused by

conditions other than or in addition to the prior water damage.  As discussed above, Mulloy's

declaration provides some insight into the timing of certain indicia of structural problems in the

Hotel.  However, the record does not establish –  either as a factual or as a legal matter – the

presence or timing of any "collapse."

To the degree that AMCO contends that the known water damage triggered the known loss

rule, it faces the obstacle that "the known loss doctrine is inapplicable if the insurer also knew of

the circumstances on which it bases the defense." *Gen. Housewares Corp. v. Nat'l Surety Corp.*, 741 NE2d 408, 414 (Ind App 2000). By the time Malbco was added as a named insured on the AMCO policy (July 31, 2005), AMCO had already investigated the 2004 claim and denied coverage. At least with respect to the water damage at issue in that 2004 claim, AMCO's knowledge appears to render the known loss rule inapplicable. Moreover, as eluded to in *Generali*, if AMCO hopes to avoid coverage on the basis of the known loss doctrine, it will have to show more than mere knowledge by Malbco of the preexisting water damage. *Kirk*, 66 Or App at 364, 675 P2d at 1072 . At this juncture, to the extent it is premised upon the argument that the known loss doctrine precludes coverage for the alleged collapse under its policy, AMCO's motion for summary judgment must be denied for lack of adequate factual support.

## VII. Other Summary Judgment Issues

In support of its summary judgment motion, AMCO also argues that Malbco's breach of contract claim is barred by ORS 742.011 because Malbco had no insurable interest in the property at the time of the loss. AMCO is correct as to any loss which occurred prior to Malbco's purchase of the Hotel in August 2005. However, if the loss occurred after August 2005, Malbco did have an insurable interest. As discussed above, the date of the loss presents a factual issue that cannot be resolved on these motions for summary judgment.

Finally, in its motion, AMCO contends that the damage to the Hotel falls within the policy exclusions and does not fall within the additional coverage for "collapse." The parties did not fully address this issue in their initial round of summary judgment motions. Furthermore, it is clear that further factual discovery is needed on how and when a "collapse" as defined by the

policy, if any, occurred.  As a result, this contention is premature and must await further

dispositive motions.

**ORDER**

(1) AMCO's Motion for Summary Judgment (docket #108) is GRANTED as to:

(a) application of Oregon law; (b) invalidity of the assignment; (c) statute of limitations for any

loss that occurred prior to October 24, 2005; and (d) lack of an insurable interest prior to the

purchase of the Hotel by Malbco in August 2005; and DENIED in all other respects.

(2) Wausau's Motion for Partial Summary Judgment Re: Application of Oregon Law

(docket #113) is GRANTED;

(3) Wausau's Motion for Partial Summary Judgment Re: Invalidity of Assignment (docket

#117) is GRANTED; and

(4) Wausau's Motion for Partial Summary Judgment Dismissal of Extra-Contractual

Claims, or, in the Alternative, for Bifurcation and Stay of Same (docket #120) is DENIED AS

MOOT.

Accordingly, Wausau is granted summary judgment against all of Malbco's claims and

Wausau is dismissed; AMCO is granted summary judgment against the Second and Third Claims

in their entirety, and against the First Claim to the extent that the loss occurred prior to

October 24, 2005.  This sole remaining claim is the First Claim for breach of contract against

AMCO based on the AMCO insurance policy issued effective July 31, 2005.

DATED this 11th day of December, 2008.

__/s/ Janice M. Stewart _____
Janice M. Stewart
United States Magistrate Judge

36 - OPINION AND ORDER