IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MALBCO HOLDINGS, LLC, individually and as
assignee of Centennial Inn-Vestments, LLC,

               Plaintiff,

     v.

AMCO INSURANCE COMPANY, a foreign
insurance corporation, and WAUSAU BUSINESS
INSURANCE COMPANY, a foreign insurance
company,

               Defendants.

CV-08-585-ST

OPINION AND ORDER

STEWART, Magistrate Judge:

Plaintiff, Malbco Holdings, LLC, ("Malbco"), is the owner of the La Quinta Inn & Suites

Hotel ("Hotel") located in Eugene, Oregon.  Malbco purchased the Hotel in August 2005 from

Centennial Inn-Vestments, LLC ("Centennial"), and became a named insured under Centennial's

insurance policy with AMCO Insurance Company ("AMCO") effective July 31, 2005.  Malbco

purchased policies from AMCO thereafter.

1 - OPINION AND ORDER

At the time of its purchase, the Hotel had some water damage, the extent of which was unknown to Malbco.  Malbco contends that in late 2005 after its purchase, the Hotel suffered a "collapse" as that term is used in the AMCO policy.  Following emergency repair work performed in late 2005 and 2006, Malbco tendered claims for coverage to AMCO which denied coverage in 2007.

In October 2007, Malbco filed this action against AMCO and another insurance company, Wausau Business Insurance Company ("Wausau"), in Spokane County Superior Court, alleging claims for breach of contract, violation of Washington's Consumer Protection Act, breach of the duty of good faith and fair dealing, and seeking a declaration that its losses are covered under the policies issued by AMCO and Wausau.  Defendants subsequently removed the case to the United States District Court for the Eastern District of Washington which transferred the case to this court.

Defendants then filed four summary judgment motions.  In December 2008, this court granted summary judgment to Wausau against all of Malbco's claims and to AMCO against the Second and Third Claims in their entirety and against the First Claim to the extent the loss took place prior to October 24, 2005.  Thus, the sole remaining claim is the First Claim for breach of contract against AMCO.

Malbco and AMCO have now filed cross summary judgment motions (dockets #225 and #230).  AMCO seeks summary judgment because:  (1) Malbco's claim falls within policy exclusions; (2) the damage to the Hotel does not fall within the policy definition for "collapse" in the "Additional Coverage for Collapse" provision; (3) even if there was a collapse, it was not caused by a named peril; and (4) Malbco's claim is barred by the two-year contractual provision.

2 - OPINION AND ORDER

Malbco seeks partial summary judgment on the same issues as AMCO, namely that: (1) the numerous exclusions cited by AMCO as affirmative defenses do not apply to the "Additional Coverage for Collapse" provision; (2) part of the Hotel collapsed as defined by the policy; (3) the collapse was caused by a named peril, namely decay hidden from view and not known by Malbco prior to the collapse; and (4) its claim is not barred by the two-year contractual provision because (a) the collapse occurred during the May 2005 - May 2006 policy period, but after October 24, 2005, and (b) AMCO materially breached the contract by denying coverage. In addition, Malbco seeks summary judgment that: (1) AMCO cannot seek a credit for sums received by Malbco in its arbitration against the building contractor because AMCO did not plead set-off or subrogation as affirmative defenses and materially breached the policy by denying coverage; and (2) AMCO's defense based on the "known loss" rule fails as a matter of law.

For the reasons that follow, Malbco's motion is granted as to AMCO's Ninth through Seventeenth affirmative defenses and the "known loss" affirmative defense. Otherwise, both motions are denied.

**UNDISPUTED FACTS**

The Hotel was constructed in 1999 and opened in 2000. At that time, it was owned by Centennial who contracted with Hospitality Associates, Inc., to operate the Hotel.

In early 2004, the Hotel's General Manager, Dan Walker, and Maintenance Manager, Clay Vance, both employees of Hospitality Associates, discovered that a spa tub in room 300, which is located in the northwest corner of the Hotel over the bike room and adjacent indoor swimming pool, was leaking from a connection of a copper water line to the tub's fill faucet. Upon further examination of rooms 200 and 300 and the bike room, which included some

observation holes in the ceiling of the bike room and in the wall of room 200, Walker and Vance discovered evidence of water damage, including mold. On February 11, 2004, Centennial submitted an insurance claim to AMCO relating to the water damage.

AMCO hired a structural engineer, Richard Kellner of K-Net Engineering, to investigate the claim. He visited the Hotel on February 24, February 27, and March 1, 2004. In the existing observation holes in the ceiling space of the bike room, Kellner observed mold and wood frame members and sheathing that were decayed and soft to the touch. At Kellner's request, Vance made additional openings to the walls in the bike room to view the bearing walls. In those openings, Kellner observed wood members in the bike room that were saturated and severely decayed and also saw more substantial mold. Kellner then prepared a report to AMCO dated March 16, 2004, which stated that the cause of the water and moisture damage observed in the ceiling space of the bike room, the ceiling and window soffits of room 200, and the area around the spa in room 300 was a plumbing leak at the base of the spa which occurred over two to five years. The report recommended uncovering the damaged ceiling, floor and wall areas, drying them out, inspecting the north ends of wood floor trusses for decay, and replacing any decayed trusses. AMCO did not provide the K-Net report to either Centennial, Hospitality Associates or Malbco prior to July 2007.

Hospitality Associates hired Belfor to prepare an estimate for mold abatement and repair work in rooms 200 and 300. Based on Belfor's recommendation in the spring of 2004, rooms 200 and 300 were sealed and placed out of service to keep the mold and fungus from spreading through the Hotel. Also in the spring of 2004, Hospitality Associates received bids from several contractors ranging from $34,363.65 to $53,437.69 to repair the water damage.

4 - OPINION AND ORDER

In the spring of 2004, there was no noticeable exterior degradation of the Hotel in the northwest corner. While there was some minor rippling of the siding, this was consistent throughout the Hotel, and it was not believed that this rippling had any relationship to the water damage. Malbco believed that the siding may have been installed incorrectly. Other than the mold abatement, no repairs were performed on the Hotel in 2004, nor did any destructive testing take place until October 2005.

On June 21, 2004, AMCO denied coverage based on the policy exclusions for leaking or seepage, negligent work, and water damage.

In August 2005, Malbco purchased the Hotel from Centennial. When Malbco agreed to purchase the Hotel, it was aware of water damage in and around rooms 200 and 300 and the bike room. Based on the information available at the time, it was anticipated that it would likely cost less than $100,000 to repair the damage.

In July 2005, James Mulloy, the owner of Malbco, inspected the Hotel and did not discern any noticeable rot, decay, or other signs of structural impairment. While Mulloy did observe some minor rippling of the siding, he believed this was caused by improper siding installation rather than water damage. If Malbco had been provided with a copy of the K-Net report, had seen the decay, or observed other evidence of structural instability, it would not have purchased the Hotel.

When Malbco acquired the Hotel in August 2005, the named insured changed from Centennial to Malbco. Hospitality Associates was an additional named insured, but only as to liability coverage and not as to property damage.

Malbco entered into a Lease Agreement with Day Island Hotel Operations, Inc. ("Day Island") to operate the Hotel. Day Island is owned by Mulloy and his wife. Day Island in turn

5 - OPINION AND ORDER

entered into a Management Contract with Hospitality Associates to run the Hotel.  Mulloy is also an employee of Hospitality Associates.

Around the date Malbco purchased the Hotel in August 2005, Malbco asked Walker to obtain new bids to repair the water damage.  In a telephone conference with Belfor on September 29, 2005, Mulloy authorized Belfor to perform discovery work by making small test holes in order for Belfor to prepare a bid for the water damage repair.  On October 4, 2005, Malbco entered into a contract with Belfor to perform exploratory work on the Hotel in order to better assess what was going on.

On October 19, 2005, Mulloy visited the Hotel for the first time since the purchase by Malbco.  During this visit, while he did see evidence of water damage, Mulloy did not see any evidence of rot at the Hotel or other evidence of structural instability.  The Hotel was still operational, and Mulloy did not see anything that would have indicated it could not be occupied, nor did anyone tell him that the Hotel could not be occupied.  It was agreed at this time that Belfor would continue in its exploratory work.

On or about November 7, 2005, Robert Johnson, a professional engineer with Artisan Engineering, LLC, visited the Hotel.  By that time, Belfor had removed pieces of siding and sheetrock in and around the pool room and some rooms above the pool room.  Johnson observed significant and severe deformation which he believed was caused by the failure of the floor truss system.  Due to his concern about its structural stability, he told Mulloy that if not repaired, the areas in and around the pool area would completely fall to the ground.  Johnson concluded that the area in and around the bike room, pool room, exercise room, conference room, and the guest rooms above those facilities could not be occupied and so advised Mulloy by letter dated November 10, 2005.

6 - OPINION AND ORDER

Johnson was contacted by Building Officials working for the City of Eugene's Building Department.  They advised him that they were prepared to "red tag" the Hotel because of its dangerous physical condition.  "Red tag" means that the City of Eugene would completely shut the Hotel down for operations.  However, because Malbco was working towards resolving the problem, the City advised Johnson that it would not "red tag" the Hotel if emergency shoring was put in place immediately and the area and rooms affected would not be occupied.

Malbco entered into a contract with Belfor on November 14, 2005 to install the shoring. Once the shoring work began and portions of the Hotel's siding and sheetrock were removed to install the shoring, additional and significant damage was revealed.  It was not possible to view this damage prior to that time.  When the ceiling above the pool room was opened, Johnson observed numerous broken floor trusses which were dry and not moldy, deteriorated or rotten. Because of the failure of the floor truss system, some parts of the Hotel around the pool room had fallen over three inches.

Approximately 20 trusses were repaired and the Hotel was lifted back to its original height.

///

## DISCUSSION

### I.    Whether the Claim is Time-Barred

The Policy contains the following two-year contractual limitations provision:

> No one may bring a legal action against us under this insurance unless:
> a.  There has been full compliance with all of the terms of this insurance; and
> b.  The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

This provision is required by Oregon law to be included in fire insurance policies. ORS 742.240; *see also* ORS 742.202. Actions brought more than two years after the occurrence of the direct physical loss or damage are barred. *See Bell v. Quaker City Fire & Marine Ins. Co., Philadelphia,* 230 Or 615, 623, 370 P2d 219, 223-24 (1962) (statutory language "inception of loss" means occurrence of casualty insured against; not accrual of liability). Oregon law does not apply a "discovery rule" to this statutorily required insurance policy provision. Inception of the loss does not mean accrual of the insured's cause of action. Suit must be brought within two years of the occurrence of the property damage. *Moore v. Mut. of Enumclaw Ins. Co*., 317 Or 235, 855 P2d 626 (1993).

Malbco filed this lawsuit on October 24, 2007, which AMCO contends is more than two years after the loss occurred. Malbco, in turn, seeks dismissal of AMCO's Second and Fifth Affirmative Defenses alleging the contractual limitations defense because the covered loss took place after October 24, 2005. Both arguments are rejected due to material issues of fact as to when the loss occurred.

AMCO's motion is premised solely on Mulloy's observations of damage to the Hotel prior to October 24, 2005. After Malbo's purchase, his first visit to the Hotel occurred on October 19, 2005. At that time, he became aware of a spa leak in room 300 that may have been the sole cause of the water damage and did not see any evidence of rot or structural instability. The Hotel was still operational, and he did not see or know anything that indicated it could not be occupied. It was agreed at this time that Belfor would continue in its exploratory work. Not until he received Johnson's November 10, 2005 letter did he learn that the structural system had failed at the Hotel and that a life-safety issue existed.

AMCO incorrectly asserts that according to Peter Fowler, Malbco's expert, the damage observed by Mulloy on October 19, 2005, constituted a collapse under the Policy.  The portion of Fowler's testimony cited by AMCO was in response to a question asking for "eye witness reports" of an "abrupt" event.  Fowler did not testify that the damage Mulloy observed on October 19, 2005, constituted a "collapse" under the policy.  Instead, he merely confirmed that an abrupt event resulting in a collapse could have occurred in the two to three month time span between Mulloy's observations in July 2005 prior to purchase of the Hotel and his later observations.  He assumed, based on the questioning, that Mulloy's later visit was in October 2005.  He was not asked and did not testify that whatever Mulloy saw on October 19, 2005, constituted a collapse.

Thus, whether the damage observed by Mulloy on October 19, 2005, was indicative of a collapse under the policy presents a factual issue, precluding summary judgment in AMCO's favor on the contractual limitations defense.

In support of its cross motion, Malbco contends that AMCO cannot rely on its contractual limitations period because it materially breached the insurance contract by wrongfully denying coverage.  That argument is nothing more than a reargument, under a different name, of its waiver and estoppel theories that this court has previously rejected.  Moreover, this court is aware of no Oregon authority supporting Malbco's assertion that by simply denying coverage, an insurer commits a material breach of contract or is precluded from relying on a limitations provision.

## II.    **Whether Policy Exclusions Apply**

AMCO alleges nine affirmative defenses (Ninth through Seventeenth) that deal with various exclusions to coverage.  Malbco seeks dismissal of these affirmative defenses because

they are premised on policy exclusions that conflict with, and are trumped by, the "Additional Coverages" for collapse. The parties agree that the only applicable basis for coverage for the collapse is under "Additional Coverages."

As AMCO correctly notes, one or more of the other policy exclusions may apply to any damages claimed by Malbco claims in addition to that caused by the collapse. However, Malbco only seeks damages resulting from a collapse. Therefore, Malbco's motion is granted as to AMCO's Ninth through Seventeenth affirmative defenses.

**III.    Whether the Hotel Collapsed**

    **A.    Policy Provision**

AMCO's Policy excludes coverage for property damage due to many conditions, including a collapse "except as provided in the Collapse Additional Coverage." The "Additional Coverages" section in the Premier Businessowners Property Coverage Form grants coverage for a collapse which it defines as follows:

> **e. Collapse**
> 1) With respect to buildings:
>     a) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of a building cannot be occupied for its intended purpose;
>     b) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse;
>     c) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of a building; and
>     d) A building that is standing or any part of a building that is standing, is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion;
> 2) We will pay for direct physical loss or damages to Covered Property, caused by a collapse of a building or any part of a building that is insured under this policy of that contains Covered

10 - OPINION AND ORDER

> Property insured under this policy, if the collapse is caused by one
> of more of the following:
>
> * * *
>
> b)  Decay that is hidden from view, unless the
> presence of such decay is known to an insured prior
> to collapse; . . .

The parties differ as to the proper interpretation of what constitutes a collapse pursuant to this provision.

### B.     Oregon Law

Under Oregon law, "interpretation of an insurance policy is a question of law." *Holloway v. Republic Indem. Co. of Am.*, 341 Or 642, 649, 147 P3d 329, 333 (2006).  In interpreting policy terms, this court is bound by the interpretive framework set forth by the Oregon Supreme Court in *Hoffman Constr. Co. of Alaska v. Fred S. James & Co. of Oregon*, 313 Or 464, 836 P2d 703 (1992), and its progeny.

Pursuant to that framework, "'[t]he primary and governing rule of the construction of insurance contracts is to ascertain the intention of the parties.'"  *Hoffman*, 313 Or at 469, 836 P2d at 706, quoting *Totten v. New York Life Ins. Co.*, 298 Or 765, 770, 696 P2d 1082, 1086 (1985) (brackets in original).  The parties' intent is determined "based on the terms and conditions of the insurance policy" itself.  *Id*.  Accordingly, in construing a particular term, the court first looks to any definition provided in the policy.  *Id*; *Groshong v. Mut. of Enumclaw Ins. Co.*, 329 Or 303, 307-08, 985 P2d 1284, 1287 (1999).

If the policy does not define the term at issue, the court must "resort to various aids of interpretation to discern the parties' intended meaning."  *Groshong*, 329 Or at 307-08, 985 P2d at 1287.  The first step in this process is to determine whether the term has a "plain meaning, *i.e.*, whether it is susceptible to only one plausible interpretation."  *Holloway*, 341 Or at 650, 147 P3d

at 333 (internal quotations, citation omitted).  If the phrase has a plain meaning, then the court applies this meaning without further analysis.  *Id*.

If the phrase is susceptible of more than one plausible interpretation, then the court proceeds to the second interpretive aid, namely an analysis of the phrase "in light of the particular context in which [it] is used in the policy and the broader context of the policy as a whole."  *Id* at 650, 147 P3d at 334 (internal quotations, citation omitted).  "The policy must be viewed by its four corners and considered as a whole.  All parts and clauses of the policy must be construed to determine if and how far one clause is modified, limited, or controlled by the others."  *North Pac. Ins. Co. v. Hamilton*, 332 Or 20, 24, 22 P3d 739, 741 (2001).

If the phrase remains ambiguous, then and only then, "any reasonable doubt as to the intended meaning of such a term will be resolved against the insurance company."  *Holloway*, 341 Or at 650, 147 P3d at 334 (internal quotations, alterations, and citation omitted).  The insured cannot simply create an ambiguity by positing a reasonable policy interpretation.  "[G]iven the breadth and flexibility of the English language, the task of suggesting plausible alternative meanings is no challenge to capable counsel."  *Hoffman Const. Co.,* 313 Or at 470, 836 P2d at 706.  "[A] term is ambiguous *only* if two or more plausible interpretations of that term withstand scrutiny, i.e. continue to be reasonable," after resort to the second interpretive aid of the policy context.  *Holloway*, 341 Or at 650, 147 P3d at 334 (internal quotations and citation omitted; emphasis in original).

### C.    The Parties' Positions

AMCO contends that the Policy unambiguously defines the term "collapse."  Applying this definition to Malbco's claim, it argues that no collapse occurred.  Accepting Malbco's

position that the collapse occurred when diagonal web members snapped within the floor truss system, which eventually caused the floor and ceiling above it to settle by over three inches, AMCO posits that there was no "abrupt falling down or caving in of the building" as required under subsection (a) of the definition of a collapse. Even if part of the building may have been "in danger of falling down or caving in," that is excluded under subsection (b). And even if part of the building separated or sustained "cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion," the Hotel remained "standing" and thus "was not in a state of collapse" under subsections (c) and (d). In sum, for the additional coverage for collapse to apply, AMCO asserts that the Hotel (or portions thereof) would have had to completely fall to the ground or to the floor, which it did not.

Malbco maintains that AMCO's interpretation is unreasonable, would render the additional coverage for collapse illusory, and totally ignores the occupancy portion of the Policy definition of a collapse. Since no structure that completely falls to the ground could ever be occupied for its intended purpose, Malbco views AMCO's interpretation as rendering superfluous the phrase following part of subsection (a): "with the result that the building or part of the building cannot be occupied for its intended purpose." Rather, Malbco contends that a building collapses by "an abrupt falling down or caving in" in any respect and, as a result, "cannot be occupied for its intended purpose." Applying that definition, Malbco also claims that it is entitled to summary judgment.

### D.    Whether the Definition is Ambiguous

Because the term "collapse" is defined by the Policy, this court's role is to determine whether it has a plain meaning or is susceptible to more than one plausible interpretation.

13 - OPINION AND ORDER

Only subsection (a) actually defines the term "collapse."  The other subsections serve merely to clarify other situations in which a building is not in a state of "collapse," namely when "in danger of falling down or caving in" (subsection (b)), "separated from another part of a building" (subsection (c)), and when showing "evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion" (subsection (d)).  Interpreting subsection (a), the issue is whether an "abrupt falling down or caving in of . . . any part of a building with the result that . . . part of a building cannot be occupied for its intended purpose" unambiguously requires a complete collapse to the ground or to the floor as contended by AMCO.

None of the words in subsection (a) are expressly defined by the Policy.  The word "abrupt" has a plain meaning, namely sudden.  However, the remainder of the definition is subject to more than one plausible interpretation.

According to AMCO, a collapse occurs when a building (or part of it) completely falls down or caves in and is no longer standing.  That interpretation is certainly plausible.  However, collapse coverage is not defined in subsection (a) simply as a structure that falls down or caves in; it also requires that at least part of the structure cannot be occupied for its intended purpose.  According to Malbco, this additional occupancy requirement means that something less than completely falling to the ground qualifies as collapse.  Otherwise, the occupancy requirement is rendered superfluous.  This interpretation of the Policy also is plausible.

Although no Oregon cases have addressed a policy provision for collapse coverage, this court has done so.  The provision in *Richardson v. Travelers Prop. Cas. Ins. Co.*, 2004 WL 1173186 (D Or May 25, 2004), covered "risks of direct physical loss involving collapse" caused by "hidden decay," but excluding "settling, cracking, shrinkage, bulging or

14 - OPINION AND ORDER

expansion." *Id* at *1.  The insured sought coverage for decay damage hidden by synthetic stucco, resulting in beams and structural members that were incapable of supporting their design loads and some of which were crumbling into a state of "imminent collapse." *Id*.  Judge Haggerty found more than one reasonable alternative meaning to the terms "collapse" and "risks of direct physical loss involving collapse." *Id* at *3.  Noting the absence of Oregon guidance on defining collapse in insurance policies, he recognized a split among other courts, but noted that the "clear modern trend is to hold that collapse coverage provisions . . . which define collapse as not including cracking and settling – provide coverage if there is substantial impairment of the structural integrity of the building or any part of the building." *Id* (citations omitted).  Being "unpersuaded" by the insurer's reliance upon the more traditional, or minority view, that coverage should be denied because the insured property did not fall to the ground, he adopted the "majority view" interpreting "collapse" as referring to a substantial impairment to the structural integrity of the property. *Id* at *3-4.  Rejecting the insurer's argument, he noted that "[i]t is not the trial court's responsibility to rewrite the policy to protect the insurer.  If [the insurer] wanted to limit its risk to actual and complete collapse to the ground, it could easily have done so." *Id* at *4.

The next year in *Schray v. Fireman's Fund Ins. Co.*, 402 F Supp2d 1212, 1214 (D Or 2005), Judge King also considered coverage "for direct physical loss to covered property involving collapse."  As in *Richardson*, the insured sought damages for a collapse caused by decay hidden behind synthetic stucco siding.  The decay resulted in the extensive property damage involving collapse to parts of the building, imminent collapse within a year to other parts of the building, and a collapse state, defined to be falling into pieces, to other parts of the

building.  The insurer claimed that coverage was not available under the collapse provision "because the house neither collapsed nor suffered structural damage requiring the Schrays to move from the house until it was repaired."  *Id* at 1216.  Given the lack of Oregon case law, Judge King concluded, as in *Richardson*, that "the Oregon Supreme Court would also follow the modern trend and apply the collapse coverage if any part of the building sustained substantial impairment to its structural integrity."  *Id* at 1218.

Both policies in *Richardson* and *Schray* covered collapse caused by hidden decay, but excluded settling, shrinking, bulging, or expansions.  AMCO's policy is worded differently, but effectively states the same thing.  Although AMCO's Policy defines collapse to mean an "abrupt falling down or caving in," it does not describe what is meant by falling down or caving in a way that is more meaningful than the policies at issue in *Richardson* and *Schray*.  It does not require that the falling down or caving in reduce the building to rubble before triggering coverage.  But unlike the policies in *Richardson* and *Schray*, the AMCO Policy adds an occupancy restriction to the definition of collapse.  Oregon courts do not construe contracts in a manner that render provisions meaningless.  *Thomas Creek Lumber & Log Co. v. State Forester*, 157 Or App 204, 213, 970 P2d 659, 664 (1998), *review denied*, 328 Or 365, 987 P2d 511 (1999) (citation omitted).  To ignore that occupancy restriction would be to render it meaningless.

The Policy is not written in terms of how far a building must fall down or to what degree a building must cave in to constitute collapse.  Clearly one cannot occupy a building if it has completely fallen down or caved in.  However, the same may be true for a building which has partially fallen down or caved in.  It is far from clear that the Policy requires total destruction in order for a collapse to occur.  Instead, the occupancy restriction stands as a proxy for a

substantial impairment of integrity by adding a life and/or safety element to the definition.  If

parts of a building abruptly fall or cave in to any degree such that they cannot be occupied for

their intended purposes under subsection (a), then a collapse has occurred.

Viewing subsection (a) in the context of the other three subsections does not change this

analysis.  Since Malbco claims that the Hotel collapsed when the trusses broke and portions of

the building fell a few inches, it was not "in danger of falling down or caving in" as excluded

under subsection (b).  Instead, it collapsed.  Furthermore, both subsections (c) and (d) exclude

certain conditions from a state of "collapse" when a building is still "standing."  This implies

that a building may still be "standing" yet still be "in a state of collapse."  And if "standing" is

deemed to be the opposite of "collapse," then it rests entirely on the definition of "collapse" as

defined in subsection (a), rendering it ambiguous.

In sum, the phrase "abrupt falling down or caving in" is ambiguous.  As a result, it must

be construed using the modern, liberal trend likely to be employed by the Oregon Supreme

Court.  That interpretation is consistent with Malbco's proffered interpretation.  Alternatively,

any ambiguity must be resolved against the insurer, AMCO.

This conclusion is consistent with an interpretation by another court of an identical

collapse provision.  In *130 Slade Condo. Ass'n, Inc. v. Miller's Capital Ins. Co.*, 2008 WL

2331048 (D Md June 2, 2008), the corner columns supporting a condominium unit had

deteriorated due to rust, causing a sudden three inch buckling, separation of the bedroom ceiling

from the wall and cracking of the wall.  Due to a danger of further collapse, the building had to

be evacuated.  As here, the insured denied coverage because the building had not completely

fallen down or reduced to rubble.  The court noted that Maryland has adopted the modern trend

of interpreting ambiguous collapse provisions to cover any serious impairment to structural integrity.  Under either the plain language of the policy or Maryland law governing ambiguous collapse provision, the court concluded that the building suffered a covered collapse by suddenly buckling three inches and rendering the building unsafe and subject to evacuation.

AMCO cites *Rector St. Food Ent., Ltd. v. Fire & Cas. Ins. Co. of Conn.*, 827 NYS2d 18, 35 AD3d 177 (2006), reaching the opposite conclusion.  However, the paucity of analysis in that case is not persuasive.

As a result, to obtain collapse coverage under the Policy, Malbco must establish that during the policy period, at least part of the Hotel (1) abruptly fell down or caved in, (2) such that it could not be occupied for its intended purpose, (3) due to decay that was hidden from view and not known to the insured prior to the collapse.

///

///

### E.     Whether a Collapse Occurred

The first issue is whether an abrupt event caused part of the Hotel to fall or cave in, such that part of it could not be occupied for its intended purpose.  According to Malbco's expert, the Hotel had fallen or dropped between three and six inches because the wood on the truss ends had decayed.  As the truss ends rotted and began to fall, the weight that had been supported at the exterior walls was shifted along the length of the trusses.  Above the pool and conference rooms, this vertical downward weight shift was too significant, causing the floor trusses to snap and parts of the Hotel to fall over three inches.  This event affecting the floor truss system occurred in a short and abrupt period of time.  The portions of the Hotel in the area of the broken floor

18 - OPINION AND ORDER

trusses was well insulated from sound, explaining  why no one heard them snap.  Malbco's

expert opines that the damage to the Hotel was caused by air, heavy with moisture, and

chemicals from the swimming pool, which traveled through the space between the floors

attacking the wood and metal components of the trusses.

In contrast, AMCO's expert states that only the diagonal web members within each truss

failed.  Those framing members are between the top and bottom chords of the floor truss system

and can break without the entire truss failing.  Thus, even though a truss element (web member)

failed, the truss itself did not completely fail and still carried load.  He opines that it is likely that

the area directly above the area of compression slowly shifted in elevation as the supporting

wood members progressively decayed which more probably than not occurred over time.  He

does not believe that this was a sudden and abrupt event.

This disagreement between the parties' experts as to when, how and why the Hotel

suffered damage is critical to a determination of whether an abrupt falling down or caving in

occurred and cannot be resolved on summary judgment.

The remaining portion of the definition requires Malbco to prove that the collapse was

caused by decay that was hidden from view and was not known to the insured prior to the

collapse.  AMCO asserts that even if there was a collapse of the Hotel, it is nonetheless entitled

to summary judgment because the collapse was caused by decay that was known to Malbco prior

to the collapse.  In support, it relies on the facts that Centennial, through its on-site employees,

Walker and Vance, knew of decay as early as February 2004, and that when Malbco purchased

the hotel in August 2005, it acknowledged known water damage, although the full extent was

unknown.

19 - OPINION AND ORDER

The difficulty with AMCO's argument is that the "insured" under the Policy is Malbco, not Centennial.  The knowledge of Walker and Vance may be imputed to Centennial based on agency principles.  "It is well established that knowledge of an agent is binding upon his principal if it concerns the business conducted through the agent, although the agent does not, in fact, inform his principal."  *Hogan v. Aluminum Lock Shingle Corp. of Am.*, 214 Or 218, 228-29, 329 P2d 271, 276 (1958).  However, the issue is not the extent of Centennial's knowledge, an insured under the Policy prior to the alleged collapse, but the extent of Malbco's knowledge.  Because the issue was not fully presented or briefed by the parties, it is premature to determine whether Malbo is bound by the knowledge of employees of Hospitality Associates.  Such a determination requires an examination of the scope of agency between Hospitality Associates and Day Island and between Day Island and Malbco.

AMCO also points out that both Hospitality Associates and Day Island were additional named insureds under the Policy.  However, AMCO concedes that they were named insureds only for the purpose of liability coverage and not for property damage.  Therefore, they were not "an insured" with respect to any provision applicable to property damage.  As a result, their knowledge is not encompassed by the named peril portion of the collapse coverage.

But even if Malbco is charged as a principal with the knowledge of Walker and Vance as its agents, the facts are disputed as to whether that knowledge is sufficient to bar coverage.  AMCO argues that the Policy does not require that Malbco know the full extent of the decay nor its cause, but must simply know of decay.  Once aware of decay, AMCO contends the insured is under a duty to investigate the extent of the decay and repair it, if necessary, instead of ignoring it and awaiting a collapse.  That argument must be rejected as contrary to the Policy language.

20 - OPINION AND ORDER

The named peril provision specifically refers to "such decay," which can only mean the decay that causes the collapse.  The issue is not simply whether Malbco, through Walker and Vance, knew of water damage in the northwest corner 18 months earlier that it believed was attributable to a leaking spa tub.  Instead, the issue is whether the insured knew prior to the collapse of "such decay" that caused the collapse.

With respect to the extent of knowledge of "such decay," Malbo has submitted evidence that the decay which ultimately caused the collapse was primarily over the pool and hidden from view, as it was behind siding, sheetrock and exterior wall sheathing.  According to that evidence, it was not until Belfor began to remove siding and wall board from the Hotel that the extent of the damage was discovered, which was in November and December 2005.  While Walker and Vance knew of some water damage and mold as early as February 2004, the decay that resulted in the collapse was not known until after Belfor began its work at the Hotel and, with the assistance of Malbco's engineer, discovered the collapse in November of 2005.  Malbco also has submitted evidence that the truss ends decayed, not due solely to the leak from the spa in room 300 which was a relatively small contributor to damage, but primarily from defects in the ventilation system in the bathrooms, conference room and pool room.  This is sufficient to create an issue of fact as to whether Walker and Vance had sufficient knowledge of "such decay" resulting in collapse to bar coverage.

Malbco makes one other argument that must be addressed.  It equates the provision relating to knowledge of hidden decay to the "known loss" rule (discussed further below) and asserts that AMCO must prove fraudulent concealment or misrepresentation.  This provision is not the "known loss" rule  for several reasons.  It is a policy provision, not a common law rule,

and must be construed using Oregon rules of policy interpretation.  Moreover, it is a requirement

of the coverage grant, not a policy condition.  Thus, AMCO does not have the burden of proof.

Instead, the insured has the burden to prove the existence of collapse caused by one of the named

perils, in this case hidden decay not known to an insured prior to collapse. Finally, unlike the

"known loss" rule, this provision does not require knowledge at the time the policy was issued,

but only "prior to collapse."

Thus, due to factual issues, neither Malbco nor AMCO are entitled to summary judgment

as to whether a collapse occurred as defined by the Policy.

## IV.   __Whether AMCO Can Seek Credit__

Because AMCO denied coverage, Malbco sued the building contractor in an attempt to

pay for the emergency shoring of the Hotel and the repair costs.  In August 2007 before this suit

was filed, Malbco recovered, some, but not all, of its damages in that action.  It now contends

that AMCO has no right to seek credit for these funds.

Over Malbco's objection, this court has granted AMCO's motion to amend its Answer to

add a Twenty-Fifth affirmative defense that it is entitled to offset any covered loss with amounts

recovered by Malbco from parties responsible for the loss based on equity and a policy

provision.  That provision provides that:  "If any person or organization to or for whom we make

payment under this policy has rights to recover damages from another, those rights are

transferred to us to the extent of our payment.  That person or organization must do everything

necessary to secure our rights and must do nothing after loss to impair them."

Nevertheless, Malbco contends that it would be inequitable to allow an insurer to deny

coverage, force the insured to expend its time and resources to obtain a portion of its covered

damages from other sources, and then, when the insured files suit to obtain coverage, seek the

benefit of those payments when coverage is found.  As posed by Malbco, the question is whether

it is more equitable to allow it to receive funds from the contractor who negligently designed and

constructed the Hotel, as well as the insurance proceeds it is entitled to obtain, or allow AMCO

to deny coverage, force Malbco into years of litigation, and when it loses, attempt to obtain the

benefit of Malbco's efforts to obtain other sources of recovery prior to the coverage litigation.

However, AMCO also an even stronger equitable argument.  The purpose of subrogation

is to prevent unjust enrichment, discourage carelessness, and avoid a windfall gain to the

subrogor.  *See Maine Bonding & Cas. Co. v. Centennial Ins. Co.*, 298 Or 514, 520 n4, 693 P2d

1296, 1300 n4 (1985).  If Malbco retained its recovery from the contractor and also obtained

insurance proceeds for damages under the Policy, then it would recover twice for the same

damage and obtain a windfall gain.

Malbco certainly has a legitimate concern about its cost and expense to obtain a recovery

from the contractor.  If AMCO receives the full amount of that recovery from Malbco in the

form of an offset against any insurance proceeds, then AMCO will obtain all the benefit of

Malbco's recovery efforts without the cost.  This unfair result can be corrected in equity by

deducting Malbco's fees and expenses to obtain the recovery from any offset claimed by AMCO.

Malbco also asserts that the subrogation provision only applies where AMCO has made

payment to an insured who has a right to collect from another.  The insured's right of recovery is

then transferred to AMCO.  In contrast here, if and when AMCO makes any payment to Malbco,

Malbco will have no present right to recover any monies.  It has already recovered those monies

against the contractor.  However, the subrogation provision also requires the insured to "secure"

and not "impair" any such rights.  Once again, resolution of this issue is premature because it has

not been fully briefed by the parties.  Thus, Malbco's motion against this affirmative defense is

denied with leave to renew.

## V.    **Whether the "Known Loss" Rule Applies**

Malbco seeks dismissal of AMCO's Twenty-Fourth Affirmative Defense based on the

"known loss" rule for several reasons.  First, it contends that based on the K-NET report, AMCO

had at least as much information, if not more, than did Malbco when purchasing the Policy in

August 2005.  It also contends that there is no evidence that Malbco knew of the loss when it

bought the Policy, since the collapse had yet to occur, or that Malbco fraudulently

misrepresented or concealed any facts from AMCO.

The "known loss" doctrine "disallows coverage where the loss to be insured is in

progress or substantially likely to occur when the insurance contract is issued."  *City of Corvallis*

*v. Hartford Acc. & Indem. Co.*, 1991 WL 523876, *8 (D Or May 30, 1991).  As this court

previously held when denying AMCO's motion for summary judgment based on this doctrine, it

is disputed when the loss occurred.  AMCO claims that the loss had occurred or was already in

progress when Malbco became an insured.  Malbco claims that the loss did not occur until the

collapse occurred in November 2005.  The "known loss" rule may apply to Malbco's claim for

collapse coverage in 2005, but only if Malbco knew that a collapse was substantially likely to

occur when it purchased the Policy.  This remains a factual dispute.

Nevertheless, based on *Commercial Bankers Life Ins. Co. v. Kirk*, 66 Or App 359, 364,

675 P2d 1069, 1072 (1984), it is likely that Oregon courts would align themselves with those

jurisdictions which only allow use of the "known loss" doctrine to invalidate coverage where the

24 - OPINION AND ORDER

insurer shows that the insured fraudulently misrepresented or concealed a material fact. *See Generali – U.S. Branch v. Bank of Montreal*, 46 F3d 141, 1995 WL 21595 (9th Cir 1995) (Table). AMCO has submitted no evidence that Malbco made any fraudulent misrepresentation or intentionally concealed any facts. Instead, due to the K-Net report, AMCO appears to have had even more information than Malbco concerning the extent and cause of the loss when the Policy was issued. Therefore, Malbco's motion is granted as to this affirmative defense.

## **ORDER**

For the reasons set forth above, AMCO's Motion for Summary Judgment (docket #225) is DENIED, and Malbco's Motion for Partial Summary Judgment (docket #230) is GRANTED as to the Ninth through Seventeenth (various policy exclusions) and Twenty-Fourth ("known loss" doctrine) Affirmative Defenses and otherwise DENIED.

DATED this 29th day of April, 2009.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge