IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

MALBCO HOLDINGS, LLC, individually and as
assignee of Centennial Inn-Vestments, LLC,

                CV-08-585-ST

        Plaintiff,

                OPINION AND ORDER

    v.

AMCO INSURANCE COMPANY, a foreign
insurance corporation,

        Defendant.

STEWART, Magistrate Judge:

      The jury found that defendant, AMCO Insurance Company ("AMCO"), breached its insurance policy with plaintiff, Malbco Holdings, LLC ("Malbco"), by denying coverage for collapse of the hotel and awarded damages to Malbco in the amount of $941,268.00. AMCO now moves for judgment as a matter of law pursuant to FRCP 50(b) or, in the alternative, for a

1 - OPINION AND ORDER

new trial pursuant to FRCP 59(a) (docket # 390). For the reasons set forth below, that motion is denied.

## LEGAL STANDARD

Judgment as a matter of law pursuant to FRCP 50(b) is proper only where the evidence permits a reasonable jury to reach only one conclusion, and that conclusion is contrary to the jury's verdict. *McLean v. Runyon*, 222 F3d 1150, 1153 (9th Cir 2000). If the verdict is supported by substantial evidence, a motion for judgment as a matter of law must be denied. *Wallace v. City of San Diego*, 479 F3d 616, 624 (9th Cir 2007). "Substantial evidence is evidence adequate to support the jury's conclusion, even if it is possible to draw a contrary conclusion from the same evidence." *Id*. The court must review the record as a whole, but disregard all evidence favorable to the moving party that the jury is not required to believe. *Id*. All reasonable inferences must be drawn in favor of the nonmoving party. *Id*. Moreover, the court may not substitute its view of the evidence for the jury's view, may not make credibility determinations, and may not weigh the evidence. *Id*; *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F3d 1222, 1227 (9th Cir), *cert. denied*, 534 US 1055 (2001).

Even if a verdict is supported by substantial evidence, the court may grant a motion for a new trial under FRCP 59 if it concludes that the verdict is contrary to the clear weight of the evidence, is based on evidence which is false, or will cause a miscarriage of justice. *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F3d 814, 819 (9th Cir 2001). "(A) stringent standard applies when the motion is based on insufficiency of the evidence. A motion for a new trial may be granted on this ground only if the verdict is against the great weight of the evidence or it is quite clear that the jury has reached a seriously erroneous result." *Venegas v. Wagner*,

831 F2d 1514, 1519 (9th Cir 1987).  A district court may not grant a new trial simply because it would have arrived at a different verdict.  *United States v. 4.0 Acres of Land*, 175 F3d 1133, 1139 (9th Cir), *cert. denied*, 528 US 1047 (1999).

## ANALYSIS

**I.    Definition of Collapse**

AMCO first argues that no reasonable jury could conclude that a collapse, as defined by the Policy, occurred.  In particular, it contends that the court instructed the jury on the wrong definition of collapse under the Policy.

AMCO's Policy excludes coverage for property damage caused by a collapse "except as provided in the Collapse Additional Coverage."  The "Additional Coverages" section in the Premier Businessowners Property Coverage Form grants the following coverage for a collapse to buildings:

> a)  Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of a building cannot be occupied for its intended purpose;
> b)  A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse;
> c)  A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of a building; and
> d)  A building that is standing or any part of a building that is standing, is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning,settling, shrinkage or expansion; . . .

According to AMCO, a collapse occurs under this provision only when a building (or part of it) completely falls down or caves in and is no longer standing.  According to Malbco, the

3 - OPINION AND ORDER

additional occupancy requirement in subsection (a) means that something less than completely falling to the ground qualifies as collapse.

At the time this court issued its decision on April 29, 2009, resolving the parties' cross-motions for summary judgment, no Oregon court had addressed a policy provision for collapse coverage.  One prior case decided by this court, *Richardson v. Travelers Prop. Cas. Ins. Co.*, 2004 WL 1173186 (D Or May 25, 2004), addressed coverage for "risks of direct physical loss involving collapse" caused by "hidden decay," but excluding "settling, cracking, shrinkage, bulging or expansion."  Noting the absence of Oregon guidance on defining collapse in insurance policies and a split among other courts, Judge Haggerty adopted the "majority view" which interprets a "collapse" as referring to a substantial impairment to the structural integrity of the property.  *Id* at *3-4.  The next year in *Schray v. Fireman's Fund Ins. Co.*, 402 F Supp2d 1212, 1214 (D Or 2005), Judge King concluded, as in *Richardson*, that "the Oregon Supreme Court would also follow the modern trend and apply the collapse coverage if any part of the building sustained substantial impairment to its structural integrity."  *Id* at 1218.

This court found the phrase "abrupt falling down or caving in" in the Policy to be ambiguous and, alternatively, found that any ambiguity must be resolved against the insurer, AMCO.  As a result, to obtain collapse coverage under the Policy, this court concluded that Malbco must establish that, during the policy period, at least part of the hotel (1) abruptly fell down or caved in, (2) such that it could not be occupied for its intended purpose, (3) due to decay that was hidden from view and not known to the insured prior to the collapse.  This conclusion is consistent with an interpretation by another court of an identical collapse

4 - OPINION AND ORDER

provision. *130 Slade Condo. Ass'n, Inc. v. Miller's Capital Ins. Co.*, 2008 WL 2331048 (D Md June 2, 2008).

AMCO now argues, based on two decisions by Oregon courts and one by this court issued after the trial of this case, that this court erroneously interpreted the collapse coverage under the Policy. Nothing in these cases warrant the relief requested by AMCO.

The same day that this court issued its decision, the Oregon Court of Appeals issued its decision in *Hennessy v. Mut. of Enumclaw Ins. Co.*, 228 Or App 186, 206 P3d 1184 (2009), construing collapse coverage under an insurance policy. The insured sought coverage for the cost to repair stucco that had visibly separated from the underlying concrete wall due to decay as a result of hysteresis and the remaining portions of the exterior that had not yet visibly separated. The insurer contended that no collapse had occurred because the stucco had not become completely detached. Because the policy did not define "collapse," the court relied on the plain meaning, construed it against the insurer, and concluded that it "does not require a complete falling down. Rather, 'collapse' requires only that an object fall some distance." *Id* at 193, 206 P3d at 1188. Accordingly, the insured was entitled to recover the costs to repair the portion of the stucco that had abruptly separated from the wall, but not the remaining stucco. Although *Hennessy* used the same methodology as this court, it did not define a collapse under the policy the same as this court. However, it construed a completely different policy provision which contained no occupancy requirement. Therefore, it is neither controlling nor helpful.

A few months later in *Ruede v. City of Florence*, 231 Or App 435, 220 P3d 113 (2009), *rev denied*, 348 Or 218, 230 P3d 20 (2010), the Oregon Court of Appeals construed a policy provision for collapse coverage substantially identical to the one at issue here. In that case, the

5 - OPINION AND ORDER

insured sought coverage for costs to repair its building after a gap in a culvert underneath the building allowed sand and earth to wash away and create voids beneath the concrete slab, which, in turn, caused the slab to sink and the walls to separate from the foundation. The court found that the loss fell under a policy exclusion and rejected the insured's alternative contention of entitlement to collapse coverage, explaining:

> In this case, there is a complete absence of evidence in the summary judgment record that the building "collapsed" within the meaning of the policy. Among other things, there is no evidence that the building or part of the building "abrupt[ly]" fell down or caved in, or that the part of the building that was affected by the erosion of earth below the floor "cannot be occupied for its intended purpose." Aside from that, plaintiffs offered no evidence that the damage to their building was anything other than the "separating from another part of the building," "cracking, bulging, sagging, leaning, [and] settling" that the policy expressly defines *not* to constitute a "collapse."

*Id* at 444, 220 P3d at 118 (emphasis in original).

As AMCO correctly points out, the court gave equal weight to the lack of evidence to each subsection of the definition of collapse. However, other than finding that plaintiff presented no evidence to support coverage, *Ruede* did not engage in any helpful analysis of collapse coverage and thus provides no persuasive basis for this court to alter or amend its prior rulings.

Contrary to AMCO's position, this court also has given effect to each subsection of the collapse coverage. AMCO relies on subsections (c) and (d), both of which provide that a "building that is standing . . . is not considered to be in a state of collapse" even if other conditions exist. Under either subsection, AMCO contends that a building which is still standing is not in a state of collapse. However, as this court previously held, these subsections serve to clarify other situations in which a building is not in a "state of collapse." To initially determine

6 - OPINION AND ORDER

when a building is in a "state of collapse," one must refer back to the definition of "collapse" in subparagraph (a) which requires "that the building or part of a building cannot be occupied for its intended purpose." AMCO's reading of subsections (c) and (d) eviscerates this occupancy requirement. To the contrary, the correct interpretation is that both subsections (c) and (d) exclude certain conditions from a "state of collapse" when a building is still "standing." This implies that a building may still be "standing" yet still be in a "state of collapse."

Finally, AMCO points to *Association of Unit Owners of Nestani v. State Farm Fire and Cas. Co.*, 670 F Supp2d 1156 (D Or 2009), where the insured sought coverage for collapse due to hidden decay. Poor stucco and roof installation had allowed water to seep in, causing portions of the supporting and weight-bearing structural members of the condominium building to crumble into pieces. The court granted summary judgment to the insurer based on the contractual limitations period and on the lack of evidence to prove that a collapse had occurred. With respect to the second issue, the insured suggested that a collapse should be defined to cover any part of the building which sustained substantial impairment to its structural integrity, citing this court's ruling. Noting the failure of *Hennessy* to construe a collapse to mean a substantial impairment to a building's structural integrity, the court rejected that suggestion and instead looked to the policy's definition of collapse as "actually fallen down or fallen into pieces." *Id* at 1162.

However, the collapse coverage in *Nestani* was materially different than in this case. AMCO's Policy defines a collapse as "an abrupt falling down or caving in of a building or any part of a building *with the result that the building or part of the building cannot be occupied for its intended purpose*" (emphasis added). In contrast, the policy in *Nestani* provided coverage for

"the sudden, entire collapse of a building or any part of a building." *Id* at 1163. It made no reference to collapse being triggered by an inability to occupy, but instead expressly required the collapse of the "entire" building. Furthermore, contrary to the insured's suggestion in *Nestani*, this court did not construe the AMCO Policy as requiring substantial structural impairment to a building. Rather, it incorporated the express occupancy restriction contained in AMCO's Policy. Although it noted that the occupancy restriction stands as a proxy for a substantial impairment of integrity by adding a life and/or safety element to the definition, its jury instruction did not refer to any substantial structural impairment.

Thus, this court adheres to its prior ruling and concludes that it correctly instructed the jury with respect to the definition of a collapse under AMCO's policy.

## II.     Evidence of Collapse

AMCO also argues that no reasonable person could conclude that the slow sagging of the exterior northwest corner of the hotel as a result of gradual rot was an abrupt falling down or caving in. However, Malbco presented evidence that an abrupt, sudden failure of the northwest corner of the hotel occurred in late October or early November 2005. This evidence consisted of the testimony of the hotel manager, Dan Walker, who observed a dramatic change in the condition of the siding in the northwest corner that occurred while he was away hunting in late October to early November. Although Mr. Walker and others noticed waviness in the siding before then, he and others testified that such waviness can be caused by improper installation. Mr. Walker's testimony was corroborated by before and after photographs and the lack of any safety concerns raised by anyone prior to that time. Only on November 7, 2005, did the entire hotel became unsafe to occupy as opined by Robert Johnson, an engineer. Earlier in 2004,

rooms 200 and 300 had been closed for mold mitigation. On October 11, 2005, the contractor started discovery work on adjoining rooms 202 and 302 and on October 27, 2005, opened holes in the pool room. However, according to Mr. Walker, rooms 202-212 and 302-312 over the pool room were not taken out of service until they were deemed unsafe to occupy by Mr. Johnson. Although this court was more persuaded by AMCO's view of the evidence, the jury clearly was more persuaded by Malbco's view of the evidence and found that a collapse occurred after October 24, 2005.

AMCO also rejects as pure speculation the testimony of Malbco's expert, Mr. McGarrigle, that the top cord of the trusses could have lost 1/8th to 3/16th of an inch in height compared to the bottom cord. However, Mr. McGarrigle performed his calculations based on photographs, and even AMCO's expert agreed that the trusses dropped some amount. AMCO also argues that such a minimal loss of height could not reasonably be construed as a falling down or caving in. In fact, when the diagonal web members were repaired, there was no evidence that the height of the top cords was raised. However, both Mr. Johnson and Mr. McGarrigle testified to a downward movement of several inches in the hotel caused by an abrupt snapping of the trusses due to rot. It was up to the jury to accept or reject this testimony.

### III. Hidden Decay

Even if a collapse occurred, AMCO argues that, based on the uncontradicted evidence, the decay which caused the alleged collapse was visible by October 19, 2005, and not hidden from view. It is undisputed that Mr. Walker and Clay Vance observed mold and rot as early as 2004 in the bike room and rooms 200 and 300. As a result, these rooms were sealed and subjected to negative pressure in order to mitigate the mold. Beginning on October 11, 2005,

prior to commencing repairs, discovery work in those areas and the pool room revealed additional significant decay. AMCO submitted evidence that when the discovery work was completed by October 19, 2005, everything was open and visible.

However, Malbco argued and submitted evidence that a spa leak above the bike room caused the decay observed before October 19, 2005. In contrast, according to Malbco's evidence, the hidden decay that caused the collapse was primarily located behind sheetrock, siding, and wall sheathing in and around the pool room and conference rooms and resulted from the failure to vent the chlorinated poor air to the outside. The moist air condensed on the exterior walls, causing significant hidden decay and rot, as well as the rusting and deterioration of metal nailing plates. As Malbco argued at trial, the knowledge of some limited decay in the bike room and rooms 200 and 300 is of no consequence if it did not cause the collapse. Substantial evidence supported that argument.

AMCO also argues that even if the decay that caused the loss was hidden, Malbco knew of that decay at the latest by October 19, 2005, prior to commencement of the contractual limitations period on October 24, 2005. Kathy Ellis, a consultant regarding the mold remediation, submitted a report to Mr. Walker dated March 22, 2005, which found moisture in the sheetrock walls above the west windows in the pool room. However, there is no evidence that anyone at that point related the cause to any problem in the pool area, as opposed to mold spreading from the spa area or water leaking through the exterior siding. Ms. Ellis also submitted mold remediation protocols dated October 1, 2005, which included the pool room, and testified to her observations of rot in the pool room on October 19, 2005. However, Ms. Ellis was not Malbco's agent and the record is devoid of evidence that any of Malbco's agents were

10 - OPINION AND ORDER

aware of her observations on October 19, 2005. To counter AMCO's evidence, Malbco submitted the testimony of its owner, James Mulloy, that not all of the hidden decay that caused the collapse was visible on October 19, 2005, and that he had no structural concerns at that time. This evidence, contrary to that submitted by AMCO, was sufficient, if believed, for the jury to find in favor of Malbco on this issue.

## IV.     Construction Defects

This court instructed the jury that AMCO's Policy covered a collapse if it was caused either by decay that was hidden from view and not known to Malbco prior to the collapse *or* if it was caused by the use of defective material or methods in construction if the collapse was caused, at least in part, by decay that was hidden from view and not known to Malbco prior to the collapse. The second alternative is based on the defective construction peril which covers collapse occurring after completion of construction "caused at least in part by a cause of loss listed in 2)a) through 2)e) above . . . ." The parties agree that the existence of a construction defect does not change Malbco's burden to prove that the collapse was caused by hidden decay unknown to the insured.

AMCO argues that there was no need to instruct the jury on the construction defect peril which may have confused the jury. However, the construction defect peril provides coverage if "at least part" of the resulting decay was hidden from view and not known to Malbco prior to the collapse. Stated differently, coverage would exist if some decay was not hidden from view, provided that other decay hidden from view "at least in part" caused the collapse. Thus, the jury instruction is permitted, if not mandated, by the language of the Policy.

///

11 - OPINION AND ORDER

///

## ORDER

For the reasons set forth above, AMCO's Motion for Judgment as a Matter of Law or New Trial (docket # 390) is DENIED.

DATED this 22nd day of June, 2010.

s/ Janice M. Stewart_____  
Janice M. Stewart  
United States Magistrate Judge

12 - OPINION AND ORDER